La Salle National Bank, a National Banking Corporation, Administrator of the Estate of Henry C. Lavery, Jr., Deceased, et al., Plaintiffs-Appellees, v. Wieboldt Stores, Inc., a Corporation, et al., Defendant-Appellant, Ada M. Zielke, Administratrix, etc., et al., Plaintiff-Appellant.

Gen. No. 49,103.

First District, First Division.

June 4, 1965.

Rehearing denied July 1, 1965.

188

Peterson, Lowry, Rall, Barber & Ross, of Chicago (A. R. Peterson, Harold W. Huff and Thomas K. Peterson, of counsel), for appellants.

Clausen, Hirsh, Miller & Gorman; Gardner, Carton, Douglas & Chilgren; Rosenbaum & Rosenbaum; Lester E. Williams; Angelo D. Mistretta; Cuneo, Wade & Quinn, all of Chicago (Sidney Z. Karasik, Jacob T. Pincus, Joseph P. Carr, and Joe A. Sutherland, of counsel), for appellees.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court.

The injuries and damages which form the basis of the six consolidated suits herein were the result of an explosion which occurred in the Wieboldt Department Store at Harlem Avenue and Lake Street in River Forest, Illinois, on March 6, 1955. In the explosion Henry C. Lavery, William F. Beckmeyer, Fred Watschke, and John Kalas,* employees of Faulds Oven & Equipment Co., were killed. Carl I. Carlson, another Faulds employee who suffered various injuries, was the sole survivor. An oven in the process of being installed in the Wieboldt bakery by the Faulds crew was destroyed. William Zielke, regularly employed by Wieboldt as an assistant stationary engineer was also killed, and extensive damage was done to Wieboldt property.

Suits for wrongful death were filed by the representatives of the estates of Beckmeyer, Lavery and Watschke, alleging negligence on the part of Wieboldt.

---

* By stipulation the Kalas matter was eliminated from this appeal.

These actions were submitted to the jury, which rendered verdicts in favor of each in the amount of $20,000. Judgment was entered on these verdicts.

The administratrix for the estate of William Zielke brought suit against Faulds for wrongful death, predicating such action on the negligence of Faulds. The trial court, at the close of all the evidence, directed a verdict for Faulds and against Zielke's administratrix.

Faulds brought suit against Wieboldt for the recovery of the balance due it on a contract for the furnishing and installation of the new oven in the Wieboldt store. Faulds claimed that its performance of the contract was prevented by the explosion caused solely through the negligent conduct of Wieboldt. Wieboldt defended on the ground that prevention of performance was the result of Faulds' negligence, and counterclaimed against Faulds for damage to its property. The trial court terminated these actions at the close of all the evidence by directing a verdict for Faulds, entering judgment against Wieboldt and in favor of Faulds for $2,936.58, and by directing a verdict against Wieboldt on its counterclaim.

It is conceded by the parties that the explosion involved in the instant case was caused by the ignition of gas which had accumulated in a crawl space beneath the floor of the bake shop in the Wieboldt Store. The bake shop was located on the first floor. The room was rather large and contained several pieces of equipment used in the preparation of the bakery goods. A gas-fired oven was located in the southeast corner of the room, and a fryer and candy stove, also operated by gas was located in the northeast corner. The crawl space was located between the basement and first floor. It was 42 inches deep, 47 feet long and 24 feet wide. Access to it was by means of a small 30″ by 42″ door, usually kept closed. The crawl space was divided

into sections, the one under the bakery being 9½ by 15 feet.

A network of gas lines supplying the equipment in the bakery, including the old oven, ran through the crawl space. A main shutoff valve was located in the basement at the gas meter, which was directly west of the crawl space. A pipe line extended east from the shutoff valve into the crawl space. At a point near the northwest corner of the crawl space the main fuel line branched into two lines. One ran east and served the fryer and candy stove. The other extended south across the crawl space to the south wall where it turned east and ran parallel to the south wall to a point just west of the oven. The line, after passing through a masonry partition which did not extend above the floor into the bakery, turned back to the north about a foot and then, by means of a 90 degree elbow, turned upward passing through a hole in the bakery floor. The protruding pipe was located about a foot from each wall in the southeast corner of the bakery. The pipe extended about a foot above the floor and crossed over 10 inches to a valve which made connection with the oven.

The principal controversy centers around the responsibility for the release of gas into the crawl space. The evidence indicates that in the summer of 1954 Wieboldt desired to replace the oven used by it for the baking of bread and rolls. Conversations took place with representatives of Faulds, and a written proposal was submitted by them, but no action was taken by Wieboldt until early the following year. The Faulds' proposal, dated June 24, 1954, reads in part: "We are pleased to submit the following proposal: (1) New style No. 424 Model X . . . set up in your bake shop at Harlem and Lake Store . . . complete except for final gas, electric and smoke connections."

194

In January, Faulds was notified that Wieboldt was prepared to consider installation of the new oven. On January 25, 1955 a meeting took place between Merrick and Olsen, superintendent and sales engineer for Faulds, respectively, and Skanderup and Campa, bakery buyer and property manager for Wieboldt, respectively. It was agreed that installation would take place over a week end, so that there would be no interference with the normal business operations of the store. It was also agreed that Faulds would install the oven "complete except for final gas, electric connections" as per the proposal of June 24, 1954. Olsen stated that a shop order directing the production of the oven could not be issued by him until he was supplied with a purchase order number from Wieboldt. This was furnished by Skanderup during the meeting. As part of the agreement Faulds accepted the old oven in trade, credit being given toward the purchase price, leaving a balance due Faulds on the new oven.

On Saturday March 5, 1955 the new oven was ready for delivery. Pursuant to its agreement Faulds engaged John Carle, doing business under the name of "Complete Oven Repair" to remove the old oven. A letter of entry was furnished Carle by Wieboldt, and he, his partner, and a helper arrived at the store at 8:00 a. m. and began to dismantle the old oven. The operation took about 8 hours and removal of the old oven was completed by 5:00 p. m.

On the trial Carle testified that there was a gas control on the feed line to the old oven at the shutoff valve. In removing this oven he was required to make a complete break in the line at a point between the valve and oven. He testified that he performed that particular function himself, and in so doing observed that "the gas control on the feed line to the oven, where the shutoff valve was, was closed," and that

195

"there was no gas leaking out of the old gas line as it was exposed, the valve was shut off."

John Faulds Jr. arrived at the bakery about one half hour before Carle and his men had left. He testified that the old gas line was sticking up through the floor after Carle had removed the oven. He remembered talking to two Wieboldt men whom he noticed were in the bakery giving directions to other men, and telling them that they would have to remove the line. "I was told it was to be taken care of, and with that I left." Carle, who was in the bakery at the time, corroborated Faulds' account of the conversation. Carle testified that Faulds was concerned with the pipe coming out of the floor and the Wieboldt man Faulds talked to said it would be capped or removed. Carle also stated that he had considerable experience working with gas lines, and that in order to make a line inoperative, it should be capped or plugged, and that irrespective of the method used, the process is called "capping the gas line."

Thomas Carlsen, a Wieboldt electrician who was at the store all day Saturday testified that he disconnected the main electrical feed line to the oven about 2:00 p. m.

The new oven arrived at the store between 5:30 and 6:00 p. m. The Faulds crew of Beckmeyer, the foreman, Carlson, Lavery, Watschke and Kalas unloaded the oven parts and began to assemble the unit about 7:00 p. m. The assembly was done a short distance from the permanent location of the oven. After some preliminary work had been completed the Faulds crew was ready to push the new oven into the southeast corner of the room as close to the walls as permissible. It was then discovered by them that the old gas line was still protruding through the floor.

At this time the only workmen in the bakery were the Faulds employees, Beckmeyer, Lavery, Watschke,

196

Carlson and Kalas, and a Wieboldt watchman. Substantially all the events leading up to the explosion were described through the direct testimony of the only man to survive the explosion, Carl I. Carlson. He testified that he noticed the valve on the pipe stub was "shut-off." To facilitate the removal of the protruding gas line one of the crew asked the watchman to call a man from the Wieboldt maintenance department. In response to such call Adolph Dick, Wieboldt's chief stationary engineer, arrived at the store between 7:00 and 8:00 p. m. dressed in regular street attire.

At this point in the evidence there is a sharp and critical conflict in the testimony given by Carlson and Dick. Continuing, Carlson testified that when Dick arrived, Dick and Beckmeyer went down to the basement where the shutoff was located on the main gas line. According to Carlson, Dick returned to the bake shop and proceeded to disconnect the valve from the protruding gas line stub. After Dick had disconnected the valve Beckmeyer asked him, "Aren't you going to cap that pipe before you drop it down through the floor?" and Dick replied, "What for. It's a disconnected line. We are not going to use it any more." Carlson stated the man who disconnected the valve from the pipe stub was Adolph Dick. Beckmeyer was also to have said to Dick that "you have to disconnect this valve or get somebody of your men to do it, we can't touch it." Carlson further stated that after Dick disconnected "the pipe and part of it dropped down" below the bakery floor, he stayed on another six or seven minutes before departing.

Dick testified that he went with Beckmeyer to the main valve in the basement where he showed Beckmeyer where to turn off the gas; that Beckmeyer turned it off, and that he did not return to the bakery but went directly home. Dick denied that he had anything to do with the protruding gas pipe, and denied

197

that he returned to the bakery and removed the valve. He stated that Beckmeyer had pointed out the valve in the bakery to him and said that it was "alive with gas and that he would like to have it shut off."

Regardless of the conflict in testimony, someone removed the gas line valve and pushed the gas line stub beneath the floor Saturday evening, and the new oven was moved into place. The Faulds crew continued to work throughout the night, the Wieboldt watchman furnishing them with sandwiches.

The new oven required gas and electric service lines. Though both the old and new ovens were gas-fired, the connections on each were at different locations. In January, Dick, in preparation for the installation of the new oven, put a "T" connection in place of an elbow in the gas line located in the crawl space which led to the candy stove, thus providing a connection from which to run new gas lines to the new oven.

On Sunday morning, March 6, three men from Wieboldt's maintenance department came to the bakery. Carl Bartler, chief Wieboldt electrician, ran the electric lines to the oven and hooked them up. He turned on the electricity to check out the lines, after first determining that there were no safety problems. Two assistant stationary engineers, Mr. Forester and Mr. Zielke, were there to run gas lines. Bartler testified that he saw Zielke "screwing pipes into one another." When a substantial portion of this work had been completed only Zielke of the Wieboldt employees remained to make the final gas connections to the oven.

From Carlson's testimony it appears that the pipe being run was long, and it took the Wieboldt men some time to work their way to the oven. While the Faulds men were still assembling the oven, the pipe had been run to about 15 or 20 feet of the oven. Forester went home, leaving Zielke to finish the job. Carlson quoted Zielke as saying that he had only "to connect up the

unions here to the new valve which were connected to the new oven." When Zielke finished hooking up the line to the oven he remained to turn on the gas and test the automatic shutoffs on the oven. After completing the hookup Zielke stated, "Now I got the gas lines hooked up. I can go down, I can turn on the gas, and I'm going to get a bite to eat."

Continuing, Carlson stated that Zielke went out and came back about half an hour later and stayed with the Faulds crew the remaining time. When Zielke returned he said, "Now I've been outside, I've had a bite to eat, and the gas is turned on, so all I got to do now, and when you fellows get through, is to turn the valves on, and check your automatic controls." The alleged statement by Zielke was made between 5:00 and 6:00 p. m. The Faulds crew worked another two or three hours. Zielke had turned on the main gas supply valve before he had gone to eat. Sometime around 8:00 p. m., while Carlson was inside the oven connecting the revolving pans, the explosion occurred. When Carlson came to, everything was dark and he found himself in water coming from the activated sprinkler system. He was removed from the debris by someone from the fire or police department.

Bernard F. Gerard, Chief of Police in River Forest, and Herman H. Flohr, the Fire Marshal of River Forest, investigated the explosion. Gerard stated that "the explosion would have occurred in the crawl space where the pipe was laying, in the section of the first floor. . . . The gas could not have come from the oven because the valve right before it went into the oven was shut off."

A joint investigative report signed by Gerard and Flohr was entered in evidence. The men also gave testimony regarding their investigation of the explosion from independent recollection of interviews they had with Carlson and Dick. Together the report and

their testimony indicate that on March 8, 1955 Carlson was interviewed in the Oak Park Hospital, at which time he stated that "he heard his foreman Mr. Beckmeyer ask a Wieboldt engineer if the 1″ pipe could be removed from the floor because the new oven would be connected from the left side by another feed in. The engineer, Mr. W. Zielke, answered that it was alright to remove this 1″ pipe because the gas was shut off and they weren't going to use that line again. So one of the men assembling the oven unscrewed the pipe coming up through the floor and Carlson said that after the pipe had been removed, he heard the pipe that was under the floor fall on something."

Further, the report indicated that the "Wieboldt engineer, Adolph Dick made a statement that on Saturday night, March 5th at about 7:00 or 7:30 p. m. he was called to Wieboldt to shut off the gas line to the bakery shop. He came over and showed one of the Faulds' workmen where the shut off was for the gas line that went to the bakery. He took this man in the basement and stood by while the workman shut the valve off. Mr. Adolph Dick then left the store." When Carlson was interviewed on March 15 he was asked if he knew the name of the Wieboldt engineer that his foreman had talked to about removing the 1″ pipe that fed the old oven. He said they called him Bill, that Bill was there when the explosion occurred. At the inquest Carlson was unable to identify Dick as the man who came to the bakery Saturday night.

The investigation report concluded by saying that "the Wieboldt explosion was caused by gas escaping from the 1″ pipe that had been disconnected from the old oven . . . ," and that the source of ignition was unknown.

Additionally, testimony was adduced of Forrest Fulmer, a Wieboldt watchman on duty at the store on Sunday, March 6. He testified that he saw some Faulds

200

men smoking about 9:45 a. m. at which time he admonished them and told them to smoke in the restaurant or washroom. When he visited the bakery at 1:45 p. m. he did not see anyone smoking then, nor at 4:45, his next round. Although the odor of gas was noticeable after the explosion, apparently no one in the bake shop or elsewhere on the Wieboldt premises detected the odor of gas before the explosion.

From the adverse judgments Wieboldt and Zielke appeal, contending that: (1) the trial court erred in directing a verdict for Faulds and against them; (2) the verdict of the jury was against the manifest weight of the evidence; (3) the trial court erred in instructing the jury; (4) the trial court improperly ruled on several matters during the course of the trial; and (5) prejudicial remarks of opposing counsel called for a mistrial. We shall discuss the various allegations of error separately.

Wieboldt and Zielke first argue that the trial court erred in directing a verdict against them and in favor of Faulds because there were presented disputed issues of fact which were improperly withdrawn from the jury, and from which the jury could infer that they were in the exercise of reasonable care and that Faulds was not. Specifically, it is urged that from the wording of the Faulds-Wieboldt contract for installation of the oven, it was within the province of the jury to conclude that the terms "except for final gas, electric . . . connections" meant that it was Faulds' responsibility to deal with all gas connections other than those joining the gas line to the new oven, and that taken together with the understanding of the parties that Faulds would remove the old oven, it would have been proper for the jury to conclude that Faulds had the duty of removing the valve and old gas line.

■■■■ Wieboldt disputes the trial court's finding that the old gas lines were, in fact, its responsibility.

It contends that the interpretation of the contract between it and Faulds should have been submitted to the jury, and that from the terms thereof, the jury could have inferred that under the contract Faulds had the duty of removing the old and installing the new gas lines, except for the "final" connections to the new oven and, therefore, that Faulds had a duty to remove and cap the old gas line. Initially, the meaning of a written contract is a question of law for the court. The fact that the parties do not agree on its proper construction does not render the contract ambiguous. Where the language used leaves the true intent of the parties in doubt, its meaning is a question for the jury only if the evidence presented on the trial shows that the construction which the parties themselves placed upon it was controverted. If, in solving the ambiguity of the contract reference be made to the surrounding circumstances which are uncontroverted by the evidence it is the duty of the court to solve the meaning of the contract. Bertlee Co., Inc. v. Illinois Publishing & Printing Co., 320 Ill App 490, 510, 511, 52 NE2d 47 (1943); Turner v. Osgood Art Colortype Co., 223 Ill 629, 79 NE 306 (1906).

In the instant case, all of the extrinsic evidence offered for the purpose of determining the intent of the parties to the contract, none of which is controverted, was given by Olsen and corroborated by Merrick who negotiated the contract for Faulds. Olsen testified that Campa made contact with him and a discussion was held at which time he told Campa that Faulds would install the oven complete, but no work would be done outside the oven, such as running gas, electric or smoke pipe connections, and that Faulds would "install the oven complete right up to the point of any connection." Campa replied that Wieboldt would take care of the connections, and told Olsen to put the proposal into writing. The forthcoming proposal dated

June 24, 1954 became the basis of the contract when accepted by Wieboldt on January 25, 1955. It was agreed at the meeting of January 25 that installation of the oven would be done over a week end so as not to interfere with normal business operations of the bake shop. Skanderup told Olsen to proceed with the proposal "and get the order in, and so as not to waste any time, we should get working on it right away."

Olsen then informed Skanderup that he could not make out a shop order unless Wieboldt furnished a purchase order number, which Skanderup supplied. During the course of trial, while Olsen was being cross-examined by counsel for Wieboldt, the latter attempted to introduce into evidence an allegedly duplicate original copy of the purchase order. Attached to Faulds' complaint was a purported photostat of the purchase order. There were certain discrepancies between the two. Wieboldt contends that the trial court erred in denying the introduction of its copy into evidence, thereby restricting its cross-examination of Olsen. Wieboldt maintains that the purchase order was accepted by Faulds and became the basis of their agreement rather than Faulds' written proposal of June 24, 1954. Wieboldt states that a prior course of dealings could have been established and evidence that modification between the June proposal and its purchase order had occurred. The question of such contradictive arrangements would then be a matter for jury determination.

Both copies of the purchase order recite the following:

> Furnish necessary labor and material to set up in bake-shop One (1) New style No. 424 Model X (32 pan) Faulds double tray, revolving tray oven with white enamel front and one side, complete except final gas, electric . . . connections, as per your proposal dated June 24, 1954.

Faulds' memorandum contains the remarks "Sat. and Sun. job. Customer to make conn. We wire motor-lights-flame o tool—We make special flue (due to ceiling ht)." Olsen explained that the words "except final gas, electric connections" meant that Faulds would not make any connections. He stated: "We didn't agree to remove the old pipe. We did not agree to any connection. . . . The term final means what it says. We would not make any connections."

As we view the record the trial court committed no error in refusing to allow into evidence a document irrelevant to the issues raised by the litigation. Whatever became the basis of the agreement between the parties, it is undisputed that Faulds was to make no connections outside the oven with respect to gas and electric lines. There is no evidence that Faulds had taken upon itself the requirement of handling any of the gas or electric lines. Wieboldt was unfettered in cross-examining Olsen with respect to his testimony as to the understanding of the parties on this issue. Both Campa and Skanderup who negotiated the contract for Wieboldt were called as witnesses on its behalf, but no testimony was offered by them in an attempt to explain the meaning of the terms thereof. Neither their testimony nor any other evidence which Wieboldt offered or attempted to offer contradicted or impaired the unequivocal testimony of Olsen as to the meaning of "final gas, electric connections."

Wieboldt's theory as to the agreement in question becomes more unsatisfactory because of its failure to introduce positive testimony which was within their reach and could have been produced by them if their contention that Faulds was responsible for the gas and electric lines, except for the final hook-ups, was correct. It was incumbent upon Wieboldt, as owner of the premises, to establish that it had parted with control over the gas lines. The purchase order does

not contain any provision which sustains their position with respect to this element of the case. Furthermore, the actions of Wieboldt's own electricians, Bartler and Thomas Carlsen, in making electrical connections and disconnections as well as the clear and convincing evidence that Forester and Zielke were running gas lines, belie its own interpretation of the responsibility of the parties for inspecting and maintaining the gas lines.

█ We conclude, therefore, that the trial court did not err in refusing to submit to the jury the interpretation to be given the contract. The court's interpretation, finding Wieboldt had not delegated its duty to exercise control and supervision over the gas lines, was manifestly reasonable and the only consistent interpretation which could be given to the clear understanding of the parties and the uncontroverted evidence.

Wieboldt and Zielke both further contend that there was sufficient evidence, taking Dick's testimony most favorably for them for purposes of the motion, from which the jury could find that the Faulds crew removed the old gas line and valve; and that even if Carlson's testimony is considered the jury could find that the Faulds crew, having been in the bakery continuously, were aware that the old gas line was uncapped, and that in remaining on the job they failed to exercise reasonable care for their own safety; and, furthermore, that they had an affirmative duty to warn Zielke that the line was uncapped when he went to turn on the gas.

█ It is well settled law that the trial court could not direct a verdict in any of the cases if there was any evidence, together with all reasonable inferences to be drawn therefrom, which would justify submission of the issues to the jury. Even where the facts are admitted or undisputed but where a differ-

ence of opinion as to the inference that may be legitimately drawn from them exists, it is primarily for the jury to draw the inference. On review, this court is not concerned with the weight or credibility of the evidence offered. A motion for directed verdict presents the single question whether there is any evidence which, standing alone and taken with all its reasonable intendments most favorable to the party resisting the motion, tends to prove the material element of his case. Lindroth v. Walgreen Co., 407 Ill 121, 94 NE2d 847 (1950); Drews v. Mason, 29 Ill App 2d 269, 172 NE2d 383 (1961).

In applying the rule to the evidence adduced in all aspects most favorable, in the first instance to Wieboldt, on its counterclaim against Faulds, it is necessary to summarize the testimony in the trial of the case.

From the evidence it appears that Wieboldt had knowledge not only of the necessity of running new gas and electric service lines, but that the old gas line and valve would be discarded. Dick testified that in January he replaced the elbow in the gas line leading to the candy stove with a "T" connection so that the necessary gas feed line could be run to the new oven. He stated that the duties of his assistants, Forester and Zielke, included working on the gas lines, but insisted that although he knew that the installation of the oven required new and different gas and electric service lines, neither he nor his men were to have anything to do with that and that he informed his men on March 4 that they were not to do anything to the ovens; that they were not to touch the gas lines, and that they were to make no connections to the ovens.

Skanderup testified that he knew the gas lines to the oven were to be connected to existing gas lines, but that the running of gas lines would not have been the function of the engineers. When Dick had arrived

206

at the bakery on Saturday evening he stated that he noticed the old gas stub and valve, and that the "gas cock" on the pipe sticking up from the floor "was closed at that time." The testimony of Olsen, Merrick, and Carlson on behalf of Faulds was that Faulds was not responsible for any of the gas or electric service lines which were required for the operation of the new oven. Additionally, there is uncontroverted testimony of Carle and John Faulds Jr. to the effect that two Wieboldt employees knew that the old line and valve represented an obstacle to the installation of the oven, and that they assured Faulds that it would be removed or capped.

 It is undisputed that failure to have the old gas line capped was a contributing cause of the explosion in the instant case. Wieboldt's duty as owner of the premises required it to take the precautions necessary under the circumstances in order to provide a work area free from any dangerous conditions which it could reasonably have anticipated. American Tel. & Tel. Co. v. Leveque, 30 Ill App2d 120, 173 NE2d 737 (1961); 17 ILP, Employment, sec 274, citing National Builders Bank v. Schuham, 319 Ill App 546, 49 NE2d 825 (1943). Wieboldt had knowledge of the necessity of running new gas lines, and of removing and capping of the old line. Wieboldt could have reasonably foreseen that failure to inspect and maintain its own gas lines at the time here involved would create an unreasonable risk for the safety of its property. Certain disputed questions of fact, particularly with respect to the responsibility for the actual removal of the old gas line which, if submitted to the jury, could be probative of Faulds' negligence cannot be considered relevant or determinative of Wieboldt's duty to properly supervise, inspect and maintain its gas lines. Wieboldt failed to establish such due care and conduct for the safety of its property as is required by law in

207

order for it to recover any damages. We therefore hold that the directed verdict against Wieboldt on its counterclaim was proper.

■ In considering the directed verdict against Zielke, the first question presented is whether he was, as a matter of law, guilty of any negligence. We cannot say from the record that it was dangerous per se for Zielke to turn on the gas Sunday evening without checking the old gas line. There is no evidence that he knew that the old gas line had been an obstacle the evening before, or that it had been unscrewed and left uncapped. The lack of due care on the part of the employer Wieboldt cannot be imputed to its employee where there is no evidence that Wieboldt specifically entrusted Zielke with the duty of inspecting the gas lines. Of course, from the nature of his work on the day of the explosion, the jury could infer that he was responsible for the entire system of gas lines involved in the bakery operation and, thus, that he had a duty to inspect all the lines before turning on the gas. But the fact that Wieboldt had knowledge that the old line would be discarded is not notice to Zielke that the line was uncapped. Whether Zielke was not in the exercise of due care for his safety, and whether he could have reasonably foreseen the consequences of his action, present factual determinations preeminently for the jury. On the evidence before us, we cannot say that Zielke was guilty of such negligence as a matter of law.

The directed verdict in the Zielke case must be reversed unless Faulds was itself not negligent as a matter of law. This determination is similarly conclusive of the issues raised by the directed verdict for Faulds on its contract action against Wieboldt. In each instance the same evidence, together with all favorable inferences must be construed for Zielke and Wieboldt, irrespective of the fact that in failing to maintain and

inspect its gas lines, we find Wieboldt was precluded from recovering on its counterclaim as a matter of law. The testimony of Adolph Dick raised legitimate disputed questions of fact for the jury as to who actually unscrewed the old gas line and valve, and who failed to take the precautions necessary to render the line inoperative and impotent of its dangerous propensities if left open and uncapped. If Dick's testimony is believed it would have been proper for the jury to conclude that some one of the Faulds crew working in the bakery Saturday evening unscrewed the line and allowed it to remain in that condition; that no Wieboldt employees, other than the watchman, were upon the premises and in a position to have unscrewed the line; that the Faulds crew worked throughout Saturday evening, and all day Sunday, and that when Zielke announced to them that he was about to turn on the gas at the main shutoff valve in the basement, no one from Faulds advised him of the prior removal of the gas line, and the fact that that line was open. From a review of this evidence the jury could have inferred that some one or all of the Faulds crew was negligent. The drawing of inferences from the evidence, particularly where such evidence is conflicting, has always been held to be within the province of the jury, and its determination was vitally necessary on the question of Faulds' negligence. We, therefore, find that these disputed questions of fact were improperly withdrawn from the jury's consideration. Consequently, the directed verdict for Faulds and against Zielke and the directed judgment for $2,936.58 against Wieboldt and in favor of Faulds should be set aside and said causes remanded for new trial.

Wieboldt next contends that the verdicts rendered by the jury for the Faulds employees, Beckmeyer, Lavery and Watschke were against the manifest

209

weight of the evidence. In arriving at its verdict the jury apparently gave credence to the testimony adduced on behalf of these Faulds employees, and particularly the testimony of the sole survivor of the explosion, Carlson. On the trial impeachment of Carlson was attempted. Both the chief of police and fire marshal of River Forest testified, and their investigation report similarly disclosed that shortly after the occurrence, and while he was hospitalized with injuries sustained in the explosion, Carlson stated that "one of the men assembling the oven unscrewed the pipe." Additionally it was brought out that at the inquest Carlson was unable to identify Dick, though at the trial he stated positively that Dick was the Wieboldt man who came to the bake shop Saturday evening and disconnected the line and valve.

The test to be applied by this court on review is a familiar one. A verdict is contrary to the manifest weight of the evidence where an opposite conclusion is clearly evident or the jury's verdict is palpably erroneous and wholly unwarranted by the manifest weight. Vasic v. Chicago Transit Authority, 33 Ill App2d 11, 180 NE2d 347 (1961). And where, as in the instant case, the evidence is conflicting and disputed questions of fact are presented, the findings of the jury will not be disturbed unless it is clear that the jurors arrived at an incorrect result, and only then will this court substitute its judgment concerning the credibility and weight to be given the witnesses. Lamar v. Toohey, 34 Ill App2d 202, 180 NE2d 511 (1962); Chouinard v. Wright, 36 Ill App2d 14, 183 NE2d 537 (1962). This is particularly true where a determination of where the truth lies concerning the testimony of various witnesses is significant in resolving the ultimate issues raised by the litigation. We find the verdicts as rendered are not against the manifest weight of the evidence if fairly presented.

Wieboldt further contends that several prejudicial errors were committed which require reversal of the verdicts. Particular stress is laid on the claim that certain comments made during closing argument by counsel for the Faulds employees were prejudicial and cause for mistrial.

In determining whether counsel's conduct was sufficient cause for reversal, the question posed is whether the improper argument was of such character as would likely prejudice the defeated party, and if so, whether the verdict was so clearly proper that a new trial ought not be granted because of the prejudicial argument.

At the close of all the evidence motions for directed verdicts were made to the court. Those granted have been discussed herein. Rulings on the other motions were reversed pending the jury's verdict. The court considered that it was its duty to inform the jury of the nature of its rulings in order to avoid any confusion which might have arisen because of the fact that the jury was not required to dispose of all the cases originally argued during the course of the trial. The court is permitted wide discretion in the conduct of the trial, and no abuse of that discretion was committed. However, the problem presented by the court's ruling was caused primarily by the fact that the causes were consolidated for trial. While such procedure was of great convenience to the parties, since common questions of law and fact were involved, nevertheless it is difficult, if not impossible, in such a situation to separate an erroneous ruling in one case from affecting the determination of the jury in the remaining cases.

The jury was required to consider the weight and credibility to be given the testimony of the various witnesses in determining where the preponderance of the evidence lay. In a case involving a close

question of liability, allegations of prejudicial conduct of counsel must be carefully considered.

It is quite clear from an analysis of the evidence already set out herein that the court not only committed error in directing verdicts for Faulds, but was also inconsistent in its rulings. Having determined that Faulds was not guilty of negligence as a matter of law, the court had in effect also determined that the employees of Faulds were not guilty of negligent conduct as a matter of law.

▄▄▄ As we have already stated the proper course for the trial court to have pursued was to send all the cases involving the disputed questions of fact pertaining to Faulds' negligence to the jury. Having erroneously as well as inconsistently ruled on the cases it was of utmost necessity that the court guard against prejudice arising from improper reference to its rulings on closing argument.

▄▄▄ The court was itself scrupulously fair in the manner in which the jury was informed of the rulings. The court stated to the jury:

> The court also wishes to inform the jury at this time the matters he has considered. The court has dismissed the counterclaim of defendant Wieboldt Stores against plaintiff Faulds Oven & Equipment Company. Faulds Oven v. Wieboldt's is no longer before you for your consideration. Likewise, the court, as a matter of law has dismissed the suit of Zielke v. Faulds Oven. The jury is not to consider—to concern itself with the action taken by the court, and the court's action should in no manner affect your deliberation of the case that remains before you at this time.

Thereafter, in closing argument, counsel for the Faulds employees stated:

212

By virtue of the court's rule here, and you know it because Judge McDermott just told you that the case of Wieboldt's against Faulds has been acted upon, that is not for your consideration. Likewise, the case of Faulds against Wieboldt's is not for your consideration. Neither is the case of Zielke against Faulds. So, if the four employees, three of whom I represent, were not guilty of any negligence in the Zielke case, how can they be guilty by their conduct or in any stretch of the imagination?

While counsel's statement is quite logical, and correct insofar as the court had determined, though improperly so, that the Faulds employees were not negligent, making comment upon the court's ruling was highly improper, particularly where, by doing so, he inferred to the jury that the court had already determined the issue of Faulds' negligence for them. In view of the closeness of the case respecting the liability of the parties, the necessity of the jury to weigh the conflicting testimony, the fact that the trial court had improperly directed verdicts for Faulds, we hold that counsel for Faulds employees committed prejudicial error in commenting to the jury as he did, and thereby prevented Wiebolt from having the causes fairly presented to and tried by the jury. Counsel for Wieboldt made an immediate motion for mistrial, which the court overruled, without instructing the jury to disregard the statements. The jury verdicts and judgments in favor of Beckmeyer, Lavery and Watschke must be set aside.

In accordance with the views herein expressed, the directed verdict against Wieboldt on its counterclaim is affirmed; the directed verdict against Zielke in favor of Faulds and the directed judgment for Faulds and against Wieboldt are reversed and remanded for

new trial; the verdicts and judgments in favor of Beckmeyer, Lavery and Watschke against Wieboldt are reversed and remanded for new trial.

Affirmed in part, reversed in part and remanded for new trial.

BURMAN, P. J. and MURPHY, J., concur.