Modern Tackle Company, Plaintiff-Appellant, *v.* Bradley Industries, Inc. *et al.*, Defendants-Appellees.

(No. 56227;

First District (1st Division)—April 30, 1973.

W. Donald McSweeney and Robert J. Vollen, both of Chicago, (Schiff, Hardin, Waite, Dorschel & Britton, of counsel,) for appellant.

James M. Goff and Harold C. Hirschman, both of Chicago, (Sonnenschein, Levinson, Carlin, Nath & Rosenthal, of counsel,) for appellees.

Mr. JUSTICE EGAN delivered the opinion of the court:

This is an action for breach of an oral contract. Count I of the complaint alleged that through a course of conduct and conversation beginning on or about January 15, 1964, Bradley Corporation, acting through its authorized representative, Morris Nozette, entered into a contract with the plaintiff whereby the plaintiff was to find an acceptable purchaser of Bradley, and, upon the purchase of Bradley by any corporation found by the plaintiff, Bradley was to pay a fee computed at various rates depending on the amount of the purchase price; that acting under the authority of and pursuant to the terms of the contract with Bradley, the plaintiff proposed to Richardson-Merrill, Inc. that Richardson-Merrill acquire Bradley; that in January, 1966, Richardson-Merrill did purchase all of the outstanding shares of Bradley for $4,140,000. Count III alleged the same agreement but that it was between the plaintiff and Morris Nozette, individually; Nozette was the president of Bradley and the owner of at least 52% of its stock. Count II was withdrawn at trial.

The case was heard by a jury; and the court reserved its ruling on the defendant's motion for a directed verdict. The jury returned a verdict in favor of the defendant, Bradley, on Count I and in favor of the plaintiff and against Nozette on Count III. After post-trial motions were heard, the court granted Nozette's motion for judgment notwithstanding the verdict; the reserved motion of Nozette for a directed verdict; and denied the plaintiff's motion for a new trial on Count I.

The plaintiff contends that a fact question was properly submitted to the jury on Count III; that it is entitled to a new trial on Count I because the court improperly instructed the jury and erred in ruling on the admissibility of evidence.

Martin Hayden was a vice-president of the plaintiff, Modern Tackle Company. He described his work: "We work as a middle man to put a

buyer and seller together and sometimes we put a buyer and seller together, and sometimes we represent the buyer and sometimes we represent the seller. We would in turn get a fee from whomever we represent." His company was in the business of acquisitions and mergers. He first met Nozette in the latter part of 1963 in Nozette's office when he was representing a company (Gleason) that was considering the purchase of Bradley. He had contacted Nozette at the request of his client's president. After the meeting Nozette told Hayden that he would like to think about the deal and that Hayden should call him after a reasonable length of time. Hayden later called Nozette and met with him at his office about the 15th of January, 1964. When asked on direct examination what conversation he had with Nozette at that time, Hayden testified as follows:

"A. At that meeting, Mr. Nozette told me that he was not interested * * * in the Gleason situation * * *. He told me that, 'Look, I am not interested in Gleason, but you are in this acquisition and merger situation. If you come across a company that meets my criteria, * * * one that will give me a solid tenant and my price, I am interested.'

* * * I said that, 'Wherein we were working with you to attempt a merger or acquisition in the Gleason matter, if we were to look for a buyer for you, we would expect to be compensated by you.' Mr. Nozette said, 'Well, what is your compensation?' And I said, 'Well, we work on a regular 5, 4, 3, 2, 1 schedule, and this is a schedule that the brokers use in the industry.' * * * And Mr. Nozette said, 'Well, I understand what the fee arrangement is, but what about costs?' I said, 'Well, what costs?' And he said, 'Well, how about expenses?' I said, 'There isn't any expenses. We will pay all of our expenses.' I said, 'If there is no deal you have no exposure.' He said, 'What about my price?' I said, 'Well, it is your price. If you don't accept the price, there is no deal. If there is no deal, you don't pay anything.' So he said, 'On that basis, you find me a buyer *at my price* and I am interested.'" (Emphasis added.)

Parenthetically, we note that we have gone to the report of proceedings to determine the actual testimony because of a difference between the abstract and brief of the plaintiff and the brief of the defendants. The abstract and brief of the plaintiff show Nozette saying: "You find me a buyer and I am interested." The brief of the defendants shows his testimony to be: "You find me a buyer *at my price* and I am interested." (Emphasis added.) The defendants' version of the testimony is correct.

On cross-examination Hayden testified that he told Nozette that his

fees were to be paid only in the event that he was instrumental in bringing a deal to Nozette that was concluded. Later Hayden wrote to Dennison Manufacturing Company informing them of the availability of Bradley; he called Nozette in the early part of 1964 and asked Nozette what the fee arrangement was. Nozette told him not to worry about the fee, that he would pay a fee if a deal was made and asked him the name of the potential buyer; when told the name, he said Dennison was an excellent company and told him: "Go ahead with the deal." Hayden wrote a letter on March 6, 1964, to the president of Dennison informing him that Nozette would forward three years' annual reports on Bradley and that Hayden would make arrangements for a meeting between Nozette and Dennison. On the same day, Hayden sent a letter to Nozette informing him that he had contacted the president of Dennison and reminded Nozette that he was to look to Nozette for his fees. On March 12 he got a letter from Dennison rejecting the deal, and he so informed Nozette, who said: "Well, I am in no hurry. You just find me a buyer at my price, and you keep looking and we are an interested seller." He had another contact with Nozette in the latter part of March at which time he received some annual reports from him. In April he sent a letter to H. R. Marschalk, the president of Richardson-Merrill, asking if they would be interested in acquiring another company. He received a letter from George Maginness of Richardson-Merrill informing him that they did not pay finder's fees; that it would be necessary for him to identify the organization he was representing so that they could advise him if the company had been brought to their attention from another source; that they were interested. He sent a copy of Bradley's annual report to Maginness. On May 11, 1964, Maginness wrote that they were not interested in acquiring Bradley and sent back the annual report. About the end of September Hayden wrote to Bemis Bag Company and after speaking on the phone to people from that company sent them some material on Bradley. On November 6, 1964, Bemis returned the material to Hayden and informed him that they were not interested in the acquisition of Bradley.

Hayden then arranged a meeting between a representative of MSL Industries, Nozette and Hayden at Nozette's office. At the meeting Nozette told the representative of MSL that he was expecting between $17 and $18 per share for the sale of Bradley. Another meeting was arranged in the early part of February, 1965, between the chairman of the board and executive vice-president of MSL, Nozette and Hayden. At this meeting Nozette was offered $14 per share. He told them that he would think about it and get in touch with them. About March 20, 1965, Hayden called Nozette and attempted to encourage him to make the deal. This

was followed by a letter dated March 22, 1965, when Hayden sent Nozette a copy of MSL's annual report and again encouraged him to make the deal. In early April of 1965 Hayden met Nozette at the Packaging Show in Chicago, and again stressed the merits of the MSL deal to him. Nozette told Hayden that he was not interested unless MSL met his $18 price and not to fool around with the Bradley situation unless he was able to come up with a buyer at $18 a share.

After the incident at the Packaging Show, Hayden had no contacts with anyone concerning Bradley until after October 18, 1965. On that date Hayden noticed an article published in the Wall Street Journal concerning Richardson-Merrill's acquisition of Bradley. He called Nozette and told him that, since Modern Tackle was the broker of record in the deal, Nozette would want the release from Modern Tackle before the transaction was closed. This was the first time that Hayden ever mentioned anything to Nozette about his contacts with Richardson-Merrill. However, during the course of the negotiations between Bradley and Richardson-Merrill, Nozette was informed that they had been contacted by Hayden. Nozette told Hayden that he had paid JBM Consultants $80,000 and, if Hayden was willing to take $40,000, Nozette would try to get it for him from JBM. Hayden declined.

The agreement between Bradley and Richardson contained a provision that Bradley would hold Richardson harmless against any claims for finder's fees. That provision had been modified to include claims by parties having oral agreements with the defendants.

Millard B. Deutsch testified for the plaintiff that he had been engaged as a business broker or finder for over 15 years. In his opinion the primary function performed by a business broker in connection with a corporate acquisition or merger is to bring the parties together, to introduce them. He was aware of transactions where a broker or finder had been paid a fee where he did nothing more than submit the name of one company to another. He said the "broker of record" is the broker who first submits a prospective acquisition to a prospective acquirer.

Nozette testified that whenever he dealt with a finder he required the submission to him of the name of the prospective buyer before a letter was written or his company offered. Nozette further testified that he had authorized Hayden to attempt to sell his company but denied the fee arrangement of 5, 4, 3, 2, and 1. (Under this arrangement, according to the plaintiff, he was to be paid a fee based on 5% of the first million dollars of the purchase price, 4% of the next million, *etc.*) He first met with a representative of Richardson-Merrill after JBM Consultants, also business brokers and finders, arranged a meeting at JBM's office in Chicago. In September, 1965, he sold Bradley to Richardson-Merrill for

$18 per share. Pursuant to a written contract with JBM he paid $81,870 finder's fee, representing 2% of the agreed sale price.

D. D. Jones made the decision on behalf of Richardson-Merrill to turn down Hayden in 1964 because he was not "sufficiently impressed with their product line and its general quality level." In the Spring of 1965 after being contacted by JBM, who brought to his attention the then "current status" of Bradley, he made an "exploratory visit" to Chicago and met Nozette. He changed his mind because one of the divisions of his company had caused a "tremendous increase in his workload" at the time he turned Hayden down; but later he became disappointed in the development of that division.

The plaintiff argues alternatively that, since he was a "finder" and not a "broker" in the usual sense, he was not obliged to be the procuring cause of the sale; but, if he was so obliged, whether he was the procuring cause was a question of fact for the jury.

■■ That there is a distinction between a finder and a broker has been recognized, as the case cited by the plaintiff makes clear. (*Bittner v. American-Marietta Co.*, 162 F.Supp. 486, 488.) The distinction is pinpointed in that decision: "There is no reliance upon the [finder] to perform the duties of the broker in *negotiating the contract*." (Emphasis added.) That is the only distinction. In *Pass v. Industrial Asphalt of Cal., Inc.*, 239 Cal.App.2d 776, 49 Cal.Rptr. 190, 194, the court said:

> "Although a 'finder' need not be licensed as a broker and need not operate under a written agreement of employment, they have certain duties and rights in common. In order to earn a commission each must accomplish the purpose for which his services were engaged, and if a transaction is had with a prospect they produce, it must be shown, in order to earn a commission, that the services were the procuring cause of that transaction."

In 24 A.L.R.3d 1160, 1173, 1179, *Validity, Construction and Enforcement of Business Opportunities or "Finder's Fees" Contract*, it is stated: "Because business opportunity brokers do not assist in the ultimate negotiations of sale, it has been held * * * that brokers' licensing requirements are inapplicable, and that the lack of such license will not preclude enforcement of a business opportunity contract." However, it is also stated that the general rule that a broker must be the procuring cause of an eventual transaction applies as well to business opportunities brokers.

■■ While, for the sake of argument, we concede that the contract was not the usual broker's contract, we hold that a business opportunity broker or finder must be the procuring cause of the transaction unless the contract specifies otherwise. (*Camp v. Hollis*, 332 Ill.App. 60, 74

N.E.2d 31.) This contract expressly requires that the plaintiff be "instrumental in bringing the deal" to Nozette that was concluded. Although the jury under this evidence would have had the duty to resolve the conflict between the testimony of Hayden and Nozette concerning the fee arrangement, contrary to the plaintiff's argument, the meaning of an unambiguous contract is a matter of law for the court. (*LaSalle Nat. Bank v. Wieboldt Stores, Inc.*, 60 Ill.App.2d 188, 208 N.E.2d 845.) We conclude, as a matter of law, that the contract does not specify that the plaintiff was to be paid even if he was not a procuring cause.

■■ The plaintiff's position is correct that whether he was the procuring cause is a question of fact for the jury; and the standard we are to apply is whether the evidence when viewed in its aspect most favorable to the plaintiff so overwhelmingly favors the defendants that no contrary verdict based on this evidence could ever stand.

The evidence shows that Hayden on two other occasions, with Dennison and MSL Industries, informed Nozette of the identity of the people that he had contacted. His only contact with Richardson-Merrill was by two letters and some phone calls. He never informed Nozette of the contact with Richardson-Merrill. His own witness, Deutsch, testified that he was a "business broker" and that the primary function of a business broker is to *"bring the parties together, to introduce them."* (Emphasis added.) Hayden did in fact introduce Nozette to MSL and urged him to accept the $14 figure. After meeting Nozette in April and learning that Nozette would stand firm at $18 for all future contacts, he did nothing further for Bradley.

■■ This contract, it must be noted, was not one giving exclusive rights to the plaintiff. In *Moehling v. Brickman*, 98 Ill.App.2d 156, 163, 240 N.E.2d 210, the court said:

> "In determining whether a broker's conduct is the procuring cause of a sale, we agree with the proposition that if a broker introduces property to a buyer who thereafter purchases the property, the broker is entitled to a commission in the absence of any intervening instrumentality which may be regarded as the effective or efficient cause of the sale. [Citations.] Where there is an intervening effective agency such as successful negotiations by another broker it follows that a broker will not be entitled to a commission merely because of his initial *introduction* of the property to a purchaser." (Emphasis added.)

In *McGuire v. Carlson*, 61 Ill.App. 295, 299-300, it was stated:

> "Unless he specifically agrees not to do so, an owner may employ two or more brokers; in such case it is the broker who is the efficient cause of the sale who is entitled to commissions; and this

right is not affected by the fact that such broker sells to one whose attention to the property had before been called by another broker. It is not the broker who first speaks of the property, but he who is the procuring cause of the sale, be he the first or second who engaged the attention of the purchaser."

Similarly, in *Whitcomb v. Bacon,* 170 Mass. 479, 49 N.E. 742, 743, the court said:

"So, where several brokers have each endeavored to bring about a sale which finally is consummated, it may happen that each has contributed something without which the result would not have been reached. One may have found the customer, who otherwise would not have been found, and yet the customer may refuse to conclude the bargain through his agency, and another broker may succeed where the first has failed. In such a case, in the absence of any express contract, that one only is entitled to a commission who can show that his services were the really effective means of bringing about the sale, or, * * * the predominating efficient cause."

■■ In this case the plaintiff never did perform what Deutsch said was the primary function of a broker—"bring the parties together, to introduce them." Hayden did not, to use his own words describing his function, "put a buyer and seller together." JBM was not only the predominating, efficient cause; it was the only cause; and like the indemnity agreement, the fact that Nozette was made aware of the contact of Richardson-Merrill by Hayden after he had been introduced to Jones by JBM has no bearing on the ultimate issue.

In view of our position on the principal issue of the case, it is unnecessary to pass on the assignment of error on instructions and admissibility of evidence or the defendants' contention that the evidence shows that the plaintiff abandoned the contract.

For these reasons we conclude that the trial court correctly granted judgment notwithstanding the verdict and denied the motion for a new trial. The judgments of the circuit court are affirmed.

Judgments affirmed.

BURKE, P. J., and GOLDBERG, J., concur.