DIXIE SQUARE THOM McAN, INC., *et al.*, Plaintiffs-Appellants and Cross-Appellees, *v.* DIXIE SQUARE MANAGEMENT COMPANY, INC., *et al.*, Defendants-Appellees and Cross-Appellants.

First District (3rd Division)    No. 76-1548

Opinion filed December 14, 1977.

Bernard E. Harrold, Douglas R. Carlson, and Steven J. Fiffer, of Chicago (Wildman, Harrold, Allen & Dixon, of counsel), for appellants.

Michael L. Shakman and Geraldine Soat Brown, both of Chicago (Devoe, Shadur & Krupp, of counsel), for appellees.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

On July 30, 1975, plaintiffs Dixie Square Thom McAn, Inc. (hereinafter Thom McAn) and Dixie Square Chess King, Inc. (hereinafter Chess King) brought this action seeking a declaration that the commercial lease each had entered into for premises in Dixie Square Shopping Center in Harvey, Illinois, had been cancelled. On August 25, 1976, the trial court granted defendants-lessors' motion for summary judgment. On appeal plaintiffs contend that there exist genuine issues of material fact as to whether defendants breached express and implied obligations pertaining to certain key tenants remaining in the shopping center for the duration of plaintiffs' leases, and as to whether defendants violated certain provisions in the leases concerning security protection which would justify

cancellation of the leases. Defendants have filed a cross-appeal from the trial court's denial of their motion to tax costs against plaintiffs.

Plaintiffs Thom McAn and Chess King are each part of national retail chains and are subsidiaries of Melville Shoe Corporation. On August 6, 1970, plaintiffs entered into separate leases for space in the shopping center. Lessor was Dixie Square Shopping Center, Inc. After a series of assignments of the leases, defendant Dixie Square Mall, a limited partnership of which defendant First Wilkow Venture is the general partner, became lessor at the time summary judgment was entered.

From pleadings, affidavits, depositions, and answers to interrogatories, the following facts were before the trial court. In December 1969, Joseph F. Bigos, vice-president of Melville and Joseph B. Clementz, its midwest representative, met with Terry C. MacDonald of the Robert Meyer Corporation which represented Dixie Square Shopping Center. The men met at a real estate industry convention in St. Louis and discussed the possibility of opening stores at Dixie Square. MacDonald offered Bigos and Clementz space in a wing of the shopping center where the principal tenant was Turn-Style, a general retailer and a subsidiary of Jewel Companies, Inc. Bigos reported that conversation to his supervisor, Ray Fogus, who refused to commit plaintiffs to leases without more information. Fogus wished to wait until a traffic pattern developed at the shopping center in order to determine whether there would be sufficient "foot traffic" to support the anticipated business in Melville's stores. In December 1969, Fogus himself inspected the shopping center. Frank Koslosky, regional sales supervisor of Thom McAn, also visited the shopping center in late 1969. Koslosky told Clementz that he estimated Thom McAn could expect $350,000 worth of business per year in the shopping center.

On or about June 6, 1970, MacDonald submitted drafts of the proposed leases to plaintiffs. On July 16, 1970, Melville sent MacDonald a three-page list of changes which it required to appear in the final drafts. Included in the list was the following:

> "Add warranty that leases executed with Turn-Style, J. C. Penney, Montgomery Ward for terms of at least 20 years and with F. W. Woolworth for a term of at least 15 years."

Plaintiffs' leasing representatives mailed revised copies of the leases to MacDonald on August 6, 1970. The revised leases contained the following provision:

> "Landlord represents, warrants and agrees that non-cancellable leases, except for default, fire or condemnation, have been previously entered into with Turn-Style, J. C. Penney Company and Montgomery Ward (herein called 'Key Tenants') for spaces in the Shopping Center as shown by Exhibit 'A' hereof, and that the

initial terms of said leases are for twenty (20) years each, and has also entered into a lease with F.W. Woolworth for space in the Shopping Center as shown on Exhibit 'A' hereof for an initial term of fifteen (15) years."

The Turn-Style store was open from 1969 until January, 1974, when it ceased retail operations at the shopping center. At all times since 1969, Turn-Style has paid rent in accordance with its obligations under its lease. At the time Turn-Style closed its store, there were nine satellite tenants, including plaintiffs, open and operating in the Turn-Style wing. By November 1975, only three of the nine stores, plaintiffs and one other, were still open and operating in that location. In December 1975, plaintiffs ceased operations in the shopping center. In the nine-month period following the Turn-Style closing, Chess King's volume of sales dropped approximately 50 to 60 percent. From 1973 to 1974, Thom McAn's sales volume dropped $94,000. The other tenants in the wing reported similar results. Attempts to secure new tenants for the wing proved unsuccessful.

In their answers to defendants' interrogatories, plaintiffs stated that MacDonald represented that certain key tenants, particularly Turn-Style, would remain in operation in the shopping center for the duration of plaintiffs' leases. In affidavits Bigos and Clementz stated that defendants had warranted that Turn-Style had entered into a noncancellable lease and that the most influential factor affecting plaintiffs' decision to execute the leases was the presence of Turn-Style which would be in operation and which had a reputation as a drawer of foot traffic. In his deposition, Bigos testified that he understood that the key tenant clause required continued operations. However, he further testified that he did not know if such was a legal requirement and that there was no clear understanding one way or another. Clementz died before defendants had an opportunity to take his deposition. In his deposition, MacDonald denied making any representations that Turn-Style or any other key tenant would continue throughout the period of plaintiffs' tenancy.

Koslosky testified in his deposition that he had not been involved in communications relating to whether Turn-Style would remain in operation although he assumed that if Thom McAn would open a store Turn-Style would be operated. Koslosky also stated that Dixie Square induced plaintiffs to lease premises in the Turn-Style wing of the mall because of the proximity to Turn-Style and the high volume of foot traffic which would result.

Michael O'Shea, a former employee of defendants who was responsible for the management of the shopping center, testified at deposition that he was not involved in the present lease negotiations. It was his opinion that the noncancellable paragraph in the leases would be

confined to rental payment. However, he also stated that if he included such a clause in a lease in behalf of a tenant he would have to admit that the clause meant continued operations.

After Turn-Style announced its decision to cease operations in the shopping center, defendants unsuccessfully sought to enjoin Turn-Style from ceasing active operation. In their complaint for an injunction, defendants recited that many of their tenants occupied space in the center in reliance on Turn-Style's presence, and that the wrong was not the loss of rent, but that Turn-Style's departure would inhibit successful operation of the shopping center as a whole.

On August 25, 1976, the trial court granted defendants' motion for summary judgment and ordered plaintiffs to pay an aggregate rental of $2,790.93 per month into an escrow account pending appeal. Defendants also moved the trial court to tax plaintiffs for costs incurred by defendants prior to the allowance of summary judgment. On September 27, 1976, the trial court denied defendants' motion.

We initially shall consider plaintiffs' principal contention that the trial court incorrectly ruled that no genuine issue of material fact exists concerning defendants' alleged breach of obligations pertaining to key tenants, particularly Turn-Style, remaining in business in the shopping center for the duration of plaintiffs' leases.

■■ Section 57 of the Civil Practice Act provides that summary judgment is appropriate "* * * if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment or decree as a matter of law. * * *" (Ill. Rev. Stat. 1975, ch. 110, par. 57(3).) Thus the right of the movant to summary judgment must be free and clear from doubt. (*Doran v. Pullman Standard Car Manufacturing Co.* (1977), 45 Ill. App. 3d 981, 360 N.E.2d 440.) The pleadings, affidavits, depositions and other documents before the court are to be strictly construed against the moving party and liberally in favor of the opponent. (*Donart v. Board of Governors* (1976), 39 Ill. App. 3d 484, 349 N.E.2d 486.) Where the party moving for summary judgment seeks to draw inferences on questions of intent, summary judgment will be deemed particularly inappropriate. *Lundin v. Egyptian Construction Co.* (1975), 29 Ill. App. 3d 1060, 331 N.E.2d 208.

In the present case, it is undisputed that during the rather extensive negotiations prior to execution of the leases, plaintiffs were told that the key tenant in the wing of the mall where they were offered space would be Turn-Style. This controversy, however, centers on the interpretation to be given the noncancellation clause of the leases which is set forth earlier in the opinion. Defendants assert that there is no question that the term "non-cancellable" simply means that Turn-Style and the other key tenants

would continue to have only a financial commitment to defendant lessors for the periods specified in the clause. Conversely, plaintiffs maintain that "non-cancellable" under the circumstances means that defendants warranted thåt Turn-Style would remain in the shopping center for the duration of the lease.

■■ We first must determine whether the parties' intent can be established by the words of the leases standing alone, or whether extrinsic evidence in the form of an oral understanding, prior negotiations, the parties' conduct under the leases, and any pertinent circumstances attendant upon the transaction. (4 Williston, Contracts §601, at 310-11 (3d ed. 1961); *Baird & Warner, Inc. v. Ruud* (1976), 45 Ill. App. 3d 223, 359 N.E.2d 745.) The principal rule in interpreting a written lease is to ascertain and give effect to the intention of the parties and to take into consideration the position of the parties, the surrounding circumstances which existed at the time of the execution of the lease, as well as the purpose or object the parties had in mind when entering into the lease. (*Dasenbrock v. Interstate Restaurant Corp.* (1972), 7 Ill. App. 3d 295, 287 N.E.2d 151.) When the language contained in the lease is ambiguous, negotiations leading up to the lease may be considered to determine the intent of the parties in their use of particular words. *Arrington v. Walter E. Heller International Corp.* (1975), 30 Ill. App. 3d 631, 333 N.E.2d 50.

Defendants argue that the term "non-cancellable" clearly means that the key tenants' commitment is merely financial. Plaintiffs contend that such an interpretation compels the conclusion that the incorporation of the key tenants clause into the leases amounts to mere surplusage since such an interpretation would not serve any purpose of plaintiffs. Therefore we must look to the lease negotiations to determine if there is evidence to establish that the term "non-cancellable" is susceptible of a meaning other than the one espoused by defendants.

Bigos stated in his affidavit that the most influential factor in plaintiffs' decision to execute the leases was the presence of Turn-Style in operation with its reputation as a drawer of foot traffic. Although Bigos' testimony indicates plaintiffs' reliance upon the continued operation of Turn-Style, he admitted in his deposition that such reliance was not communicated to defendants during negotiations prior to execution of the leases. Bigos testified that, "[t]here was no understanding one way or another" as to whether plaintiffs had the right to cease operating if Turn-Style discontinued its operations in the shopping center.

In support of defendants' assertion that the leases did not contain either an express or an implied warranty that Turn-Style would remain in business for the duration of plaintiffs' leases is the deposition of MacDonald. In his deposition, he explicitly denied making any representations that Turn-Style or other key tenants would continue

operations throughout plaintiffs' tenancy. That testimony, in conjunction with the failure of Bigos and other representatives of plaintiffs to communicate their belief that Turn-Style would remain in business, necessitates the conclusion that an interpretation of "non-cancellable" as meaning continued operations was an unexpressed assumption on the part of Bigos and other representatives of plaintiffs. That unarticulated assumption cannot import an agreement between the parties to a condition in the leases.

■■ The record demonstrates that the circumstances surrounding the negotiations for the leases are uncontroverted by the evidence. No representations were made by defendants that Turn-Style would continue in operation throughout plaintiffs' tenancy, and plaintiffs have failed to present any evidence to indicate that the term "non-cancellable" means more than a financial commitment on the part of the key tenants. Therefore, the resolution of the ambiguity was for the trial court to determine. We believe that the finding of the court was correct. See *La Salle National Bank v. Wieboldt Stores, Inc.* (1965), 60 Ill. App. 2d 188, 208 N.E.2d 845.

Plaintiffs also submitted the affidavit of Joseph Clementz who died before defendants were able to take his deposition. Defendants have objected to a consideration of the contents of his affidavit, claiming a denial of their right of cross-examination and stating that such evidence would not be admissible at trial. Since the Clementz affidavit merely indicates an assumption on his part that Turn-Style would remain open and representation by MacDonald that the key tenant leases would be in effect throughout plaintiffs' tenancy, it, too, is insufficient to raise a factual issue pertaining to a continued operations agreement between the parties. Therefore, its admissibility at trial need not be considered here.

■■ We further hold with little discussion that the trial court properly ruled that defendants were entitled to summary judgment with respect to security protection for the leased premises. The following provisions are contained in the leases in question:

> "Tenant shall have full responsibility for protecting the Premises and the property located therein from theft and robbery, and shall keep all doors, windows and transoms securely fastened when not in use.
>
> \* \* \*
>
> Neither the Landlord, or its agents, or employees, shall be liable and the Tenant waives all claim for damage to personal property sustained by the Tenant, or any occupant of the Premises or other part of the Shopping Center, resulting directly, or indirectly, from the Premises or any part thereof, or any part of the Shopping Center, or any equipment or appurtenances being or becoming out

of repair, or resulting from any accident or occurrence in or about the Premises, or the Shopping Center, or resulting directly, or indirectly, from any act or neglect of any tenant or occupant, or of any other person."

In our view the language contained in the leases clearly exempts defendants from any and all liability for damages resulting from the acts of the third persons. The foregoing language also explicitly recites that plaintiffs assume full responsibility for protecting their stores from theft and robbery. Both provisions are clear and unambiguous, thus affording no basis for cancellation of the leases. Plaintiffs' assertion that defendants breached plaintiffs' express covenant for quiet enjoyment also is without merit. That clause recites that defendants covenant that plaintiffs shall hold the premises "free from molestation, eviction or disturbance by the Landlord or by any other person or persons lawfully claiming or to claim the same." Since the acts complained of by plaintiffs are the illegal acts of third persons and not those of the landlord or any person who could assert a lawful claim to the premises, this covenant has no application to the present case.

Without discussion we hold that the trial court correctly denied defendants' motion to tax costs against plaintiffs for costs incurred by defendants prior to the allowance of summary judgment.

For the reasons stated, the order of the circuit court of Cook County granting summary judgment to defendants is affirmed. The order denying costs to defendants is also affirmed.

Affirmed.

JIGANTI and McGILLICUDDY, JJ., concur.