**Fred EHRMAN, Plaintiff–Appellant,**

v.

**COOK ELECTRIC COMPANY and Northern Telecom Limited, Defendants–Appellees.**

**No. 79–2373.**

United States Court of Appeals, Seventh Circuit.

Argued May 9, 1980.
Decided Sept. 17, 1980.

**530**

George W. Hamman, Chicago, Ill., for plaintiff–appellant.

Stewart S. Dixon, Chicago, Ill., for defendants–appellees.

Before CUMMINGS, Circuit Judge, NICHOLS, Associate Judge,* and PELL, Circuit Judge.

PER CURIAM.

The plaintiff, Fred Ehrman, appeals from the judgment entered by the district court after granting the defendants' motion for a directed verdict under Fed.R.Civ.P. 50(a).

■ The plaintiff argues, and we agree, that Illinois law applies to this case.[1] To recover a finder's fee under Illinois law, the plaintiff must demonstrate the existence of an agreement, express or implied, to pay for services in finding an acquisition or merger candidate, and that he was the procuring cause of the ultimate transaction. *See Modern Tackle Co. v. Bradley Industries,*

*Inc.,* 11 Ill.App.3d 502, 297 N.E.2d 688, 692–93 (1973); *Hennessy v. Schmidt,* 521 F.2d 1282, 1286 (7th Cir. 1975). To be the procuring cause of the acquisition, the plaintiff must show that he brought one party to the acquisition to the attention of the other party for that purpose, and that the acquisition actually took place through his efforts. *Modern Tackle Co., supra; Bittner v. American–Marietta Co.,* 162 F.Supp. 486 (E.D.Ill. 1958). The finder is not a broker and need not participate in negotiations. *Modern Tackle Co., supra.* Finally, the plaintiff must prove that the contract was breached, resulting in damages.

■ The district court held that the plaintiff submitted sufficient evidence to raise a question of fact as to all of the elements of his case against both defendants on an implied contract theory, except as to damages. The defendants argue that the district court's ruling should be affirmed if it is correct for any reason, and argue that even if there were sufficient evidence of damages,[2] the evidence relevant to the other elements of the plaintiff's case is insufficient to create a question for the jury. We agree with the district court that the evidence against both defendants was sufficient to create a jury question on the issues of whether there was an implied agreement with either or both to pay a finder's fee, and whether the plaintiff was the procuring cause of the merger.[3] We disagree with the district court's ruling that there was insufficient evidence to create a jury question on the issue of damages, however, and accordingly, must reverse the judgment.[4]

---

* Judge Philip Nichols of the United States Court of Claims is sitting by designation.

1. The defendants urge that the district court erred in not applying the law of New York. We are persuaded by Judge Robson's opinion, 468 F.Supp. 98 (N.D.Ill.1979), that Illinois law controls this case.

2. The defendants, of course, do not concede that the evidence as to damages was sufficient to create a jury question.

3. There is no dispute that the merger actually took place.

4. The dissenting opinion does not disagree with our holding that there was sufficient evidence on damages to require this case to be submitted to the jury but disagrees with our holding, and the conclusion of the experienced district court judge, an Illinois lawyer, that the evidence against both defendants was sufficient to create a jury question on the issues of whether there was an implied agreement with either or both to pay a finder's fee, and whether the plaintiff was the procuring cause of the merger. Credibility questions are inherent in the determination of these issues.

Considering only the operative facts in favor of the plaintiff, disregarding conflicting and unfavorable testimony, and drawing inferences in favor of the plaintiff, see *Oberlin v. Marlin American Corp.*, 596 F.2d 1322, 1326 (7th Cir. 1979), we conclude that a jury reasonably could have found that the defendants, acting through Mangle and Stark, impliedly agreed to use Ehrman as a finder, and that Ehrman's efforts brought about the acquisition. Although there is little evidence to show an express agreement to this arrangement or to compensate Ehrman for his services, there is sufficient evidence that the customary fee arrangement in this field, based on the so-called 5,4,3,2,1 formula, is a reasonable measure of damages for the implied contract.

Ehrman called Stark, financial vice-president of Northern, and introduced himself as a partner of the firm of Shufro, Rose, and Ehrman. According to Ehrman's testimony, "I told [Stark] that we were investment advisors as well as involved in mergers and acquisitions." Stark requested the name of the prospective acquisition and more information, and, according to Ehrman, "said to me that he was unaware of the existence of this company. He had never heard of Cook Electric Company." Later, Ehrman sent a letter to Stark explaining that Cook authorized him to contact Northern on their behalf, and adding, "Should Northern Electric ultimately acquire Cook Electric, we would expect to receive the finder's fee based on the customary 5,4,3,2,1 formula." Stark was a sophisticated businessman, and despite Stark's later letter rejecting the finder's arrangement, his original request for information from Ehrman and Northern's subsequent consummation of the acquisition are sufficient at least to create a jury question on whether the finder's relationship existed between the plaintiff and Northern. See *Schaller v. Litton Industries, Inc.*, 307 F.Supp. 126, 131 (E.D.Wis.1969) ("One who speaks one way and acts another should be judged by what he does and not by what he says.") The defendant Northern certainly had a motivation to send the letter to avoid liability to Ehrman, even if it fully intended to take advantage of the opportunity he disclosed.

As to Cook Electric, Ehrman testified that

I said to Mr. Mangle that if a transaction ultimately arose between Cook Electric and Northern or any other possible acquiror that my firm would be protected. . . . Mr. Mangle, then, inquired of me what I meant by protected; and I said to him I would assume that we would get a fair fee if a transaction ultimately arose between Cook Electric and another company that I brought to Cook's attention or brought Cook to its attention. Mr. Mangle answered me, okay, don't worry about it. You will be protected.

Cook argues that the use of the term "protected" clearly shows that Mangle was to act only as a surety if the finder's fee was not paid by Northern. Such a surety agreement, Cook further argues, is barred by the Illinois statute of frauds, Ill.Rev.Stat. ch. 59, § 1 et seq.[5] Mr. Ehrman's reply to Mr. Mangle's question defines "protected" merely as meaning he would receive his fee. One might infer the existence merely of a

---

We have not indicated in this opinion that the case is a strong one but merely have held that under Illinois law there were sufficient factual questions to mandate jury consideration. That this might not have been true if the law of some other state had been applicable is not our concern here. The dissenting opinion sets forth an extensive factual analysis which when argued to a jury might well be persuasive. The jury, however, in our opinion, is the proper body to which this analysis should be presented rather than this appellate court notwithstanding that in appropriate cases this court can affirm on other grounds than those on which the trial court decision rested.

5. The plaintiff argues that this statute of frauds defense was not pleaded in accordance with Fed.R.Civ.P. 8(c) and that it was therefore waived. Although we conclude that this affirmative defense was properly raised in the paragraph of Cook's answer labeled "FIRST AFFIRMATIVE DEFENSE," Cook has not argued suretyship with any specificity until this appeal, indicating to some extent that the evidence of such a relationship is lacking.

surety relationship, but the evidence is hardly sufficiently compelling to support a directed verdict for Cook.

On the issue whether Ehrman was the procuring cause of the merger, the defendants emphasize the proposed Browning meeting in 1971 or 1972 and the Stark letter as evidencing past contacts between Cook and Northern. The evidence of these contacts shows them at most to have been fleeting, and it is therefore for the jury to determine the significance of the plaintiff's role in the light of all of the circumstances in subsequently bringing about the merger. Indeed, the evidence at this point shows that the Browning incident was mentioned only after the plaintiff's initial request for a fee, and is contradicted by the plaintiff's initial conversation with Stark, during which Stark told the plaintiff that he had never heard of Cook.

Finally, as to damages, the plaintiff had the burden of submitting evidence of the fair and reasonable value of the services rendered under the implied contract. On this issue, the plaintiff was permitted to submit only the following evidence: the letter from Ehrman to Stark demanding a fee calculated under the customary 5,4,3,2,1 formula, and Ehrman's testimony that the application of this formula would result in a fee of approximately $397,000 and that this customary figure was fair compensation for his services. The defendants argue that this amount is "ludicrous" to claim under the circumstances. The evidence shows, however, that such acquisitions are consummated only infrequently, and a jury could conclude on this basis that the importance of the plaintiff's role to the defendants is thereby more significant than it might at first seem and that the apparent "windfall" to the plaintiff is only reasonable compensation in light of years of attempted mergers that yielded him nothing. *See Schaller v. Litton Industries, Inc., supra,* 307 F.Supp. at 132–33 (calculating the reasonable value of finder's services under an implied contract on the basis of the 5,4,3,2,1 formula).[6]

The judgment of the district court is reversed and the cause is remanded under Circuit Rule 18 for a new trial.

REVERSED.

NICHOLS, Associate Judge, dissenting:

With all respect, I would affirm, though not on the district judge's grounds. I do not think this case should go to the jury because I see in Ehrman's own version of the facts, if fully believed, no fact issue for a jury to decide.

The so-called merger itself was a sale of the Cook stock by Cook stockholders. This stock was listed on the American Exchange. It had fallen from $13 to $7 a share in the 1973–74 decline. Stockholders received $15 a share, a total cash consideration of $29,790,420. A previous proposal to issue Northern stock to them for their Cook stock had fallen through.

Mr. Ehrman had acquired his knowledge of and interest in Cook through his activities as a stockbroker, in advising customers' investment in Cook as an investment adviser, as actually investing himself, when employed to manage customers' portfolios, and investing with his own money. In those capacities he had been given a tour of Cook's plant and a conference with Mr. Mangle, Cook's President, in which they discussed Cook's problems. There were subsequent telephone conversations. Plaintiff received financial data, whether publicly available or confidential does not appear. He learned of a change of attitude when, from opposition to being acquired, Mr. Mangle was coming to view it favorably.

As the Cook stock had fallen, Mr. Ehrman might have been hearing from investors whom he had caused to acquire some of it, for whom the merger must have been a blessing.

Thirty percent of the Cook stock was owned by three Edwards brothers and apparently this 30 percent gave them control.

---

6. The plaintiff has also challenged several of the district court's evidentiary rulings. Because of our disposition of the directed verdict issue, we need not address these arguments. The plaintiff of course is free to offer this evidence again at a new trial.

Their interests respecting possible mergers might have conflicted with those of scattered owners, such as Mr. Ehrman's clients, who had no control.

Mr. Ehrman commenced his entrepreneurial activities by advising Mr. Mangle of Northern's existence and its suitability as a candidate to acquire Cook. He asked permission "to contact Northern on behalf of Cook," and received it, according to his testimony. He then phoned Mr. Stark of Northern, at Montreal and said he was a partner of his New York brokerage firm, and that they were investment advisers, as well as involved in mergers and acquisitions. He said his firm represented a block of stock in a company he later identified as Cook and he suggested to Mr. Stark it might be a suitable acquisition. He apparently said nothing about having been authorized by Mr. Mangle to negotiate a merger in Cook's behalf. Mr. Stark asked for financial data on Cook, including a product catalogue, which Mr. Ehrman had to obtain from Cook. Upon obtaining the data, he sent it to Mr. Stark with a covering letter. This letter told of Mr. Ehrman's interest in Cook, and of his having been authorized by Cook to get in touch with Northern. Should Northern ultimately acquire Cook "we would expect to receive a finder's fee based on the customary 5–4–3–2–1 formula." He did not say who was to pay it, but the obvious innuendo was that Northern would. This was Mr. Stark's interpretation as he said in his response that " * * * *we* would not be prepared to pay a finder's fee * * *." [Emphasis supplied.] If Mr. Ehrman wanted such a fee he should go to those who had sent him. Apparently Mr. Stark deviated somewhat from the truth in stating that Northern had already considered Cook, as he did in the same letter, but I do not see how he owed any duty to Mr. Ehrman to inform him truthfully. After Mr. Ehrman wrote Mr. Stark, but before receiving the reply, he conversed on the telephone with Mr. Mangle and said he expected to be protected, by which he meant he would get a fair and customary fee in case of a merger. Mr. Mangle is said to have replied—"Ok, don't worry about it, you will be protected."

This could have been intended as a mere expression of an opinion that Ehrman would have a good claim against Northern. It is ambiguous, and could be read as committing Cook.

There were interests of three basic kinds affected by the merger: Northern to get ownership and control on the most favorable terms, Cook's management stockholder group to exact proper compensation for the value of their stock *and* for parting with control, and the nonmanagement stockholder group, including Mr. Ehrman himself, to get the best value for the stock, but with no interest in control, which they had not to lose. Cook Electric Company, in the event of merger, had no interest separate from Northern, since Northern would have to pay any money obligation incurred by Cook unless the merger terms were so framed as to throw finders' fees on the selling stockholders. There is no hint of this in the record. I assume the claim is really against Northern though Cook is also named as a defendant.

Mr. Ehrman performed no service to effectuate the merger except as stated above. For this he wants $397,904.20. He may be entitled to it, however, if the persons he talked to, Messrs. Mangle and Stark, said things adequate to commit their companies *or either of them* to such a figure and were so understood by Mr. Ehrman. People are bound by the contracts they make, not those that in all prudence they should have made. Both Mr. Mangle and Mr. Stark represented corporations, however. They were not speaking for sole proprietorships with themselves as the sole proprietors. Mr. Ehrman should have understood this. What Mr. Ehrman might understand of their words also depended on what he himself had said.

Originally, Mr. Mangle retained Mr. Ehrman. He might have asked himself, therefore, whether he retained him to represent the stockholders, or Cook Electric. If the former, he might ask himself how he could represent individuals whose authority to do

so he had not obtained. If the latter, he was really obligating the putative takeover company, whose identity even was not yet known. This dilemma Mr. Ehrman should have been aware of and it should have guided him in interpreting what Mr. Mangle said. He should not have resolved the ambiguity in Mr. Mangle's words, especially that Mr. Ehrman would be "protected" as a commitment to bind some person or persons unstated and unidentified to pay $397,-904.20. It is reasonable to suppose that Mr. Mangle eventually learned with a sigh of relief that Mr. Ehrman was looking to Northern.

Mr. Stark, when he accepted information about Cook and asked for more, had already learned in the same telephone conversation, that Mr. Ehrman was a stockholder in Cook and investment advisor of other stockholders, constituting a group he represented. He would naturally, therefore, think Mr. Ehrman was suggesting a takeover in the interests of his stockholder group, to whom naturally he would look for remuneration. By Mr. Ehrman's own account he said nothing to alert Mr. Stark that Northern was to pay his fee of $397,904.20 until his letter of February 3, 1975. To be exact, Mr. Ehrman only said even then he was to be paid, not by whom. Mr. Stark, however, says in his March 12 reply that Northern will not pay the fee, so he must have understood the February 3 letter as making such a demand on Northern which he must have considered outrageous.

Thus, Mr. Ehrman blew hot and cold, claiming to represent different interests at different times. The theory seems to be that somehow Messrs. Mangle, Stark, and Ehrman made a contract implied in fact that bound them jointly and severally although neither of the two corporate executives said enough, separately, to have bound his own company, separately, and each seemed to suppose someone else would be bound. By this theory, a "finder" need but inform two companies of each other's existence and merger potentiality, and advise them he expects to be paid, and presto! if they merge they have bound themselves to pay his fee. The only way they can avoid paying him is not to merge. The custom requiring real estate broker's fees affords an analogy, but careful brokers always make sure the parties understand whom they represent, and it is always one, not both, and to that one the broker always looks for his fee. The finder, however, need not conduct any negotiations, and here he could not have, because of his obvious conflict of interests. Mr. Ehrman is quite frank to say in his brief that the $397,904.20 will compensate him not only for this successful coup but also for a number of other instances where he worked hard and still the finder's fee eluded him. This finder's fee is apparently a little gamble the law requires corporate executives to dabble in, but in which the alleged finder frequently loses, and so gets a big payoff when he wins at all.

It appears to me that the law should look at these transactions to insist on being shown who was bound to pay the fee and how he became bound. It should not allow a fee claim to be built up out of the subjective expectations of the claimant and saddled on whomever appears to be a handy target. Had it been convenient to sue the former stockholders, a claim against them would have been as good or bad as the one actually prosecuted. The stockholders benefited but had no awareness of Mr. Ehrman's expectations. The benefit to others is less clear but the corporate executives knew Mr. Ehrman expected—or at least wanted—to be paid. Each one had every reason to expect Mr. Ehrman was working for someone else. The essence of a valid claim for compensation for personal services is a clear understanding for whom the claimant is working, and a clear showing by word or act by those to be charged that they understand the claimant is working for them. He cannot be working simultaneously for all the parties to a bargained transaction, and hold all liable by aggregating everything anyone said or did.