Max LIRTZMAN, Plaintiff-Appellant,

v.

FUQUA INDUSTRIES, INC., and
National Industries, Inc.,
Defendants-Appellees.

No. 81–2525.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 24, 1982.
Decided April 29, 1982.

Bruce M. Friedman, Boehm & Weinstein, Chtd., Chicago, Ill., for plaintiff-appellant.

Mary Anne Spellman, Chatz, Berman, Maragos, Haber & Fagel, Chicago, Ill., for defendants-appellees.

Before SWYGERT, Senior Circuit Judge, SPRECHER, Circuit Judge, and BARTELS,* Senior District Judge.

SPRECHER, Circuit Judge.

This appeal from a case brought under diversity jurisdiction involves questions relating to the status of finders and their entitlement to fees.

---

* Honorable John R. Bartels, Senior District Judge for the Eastern District of New York, is sitting by designation.

I

In March, 1975, Kenneth A. Lirtzman, an employee of NII Metals Corporation, a subsidiary of National Industries, Inc., became aware of the fact that National might be interested in selling its Hawthorn Mellody Inc. subsidiary, which operated a milk business. Kenneth contacted his father, the plaintiff in this action, and notified him of that fact, believing that the father could possibly earn a fee if he was able to find a buyer for Hawthorn Mellody. (KAL affidavit, pars. 1, 2 and 3; L. Dep. 15, 18).[1]

The plaintiff's experience has been in the construction business (L. Dep. 11) and he is presently a partner in a firm acting as developers and general contractors. (L. Dep. 13). In 1974, he was employed by Enviro-Technics, Inc. as a construction manager and contractor. (L. Dep. 20–21; D. Dep. 39). Later in 1974, the plaintiff became the president, sole shareholder, and principal operating officer of Comaco, Inc., a corporation in the construction business. (Plf's. Answer to Interrogatories, Answer 6(e); L. Dep. 12, 21–22). The plaintiff's wife was vice president and his son was secretary of Comaco, which shared a common general office with Enviro-Technics. (L. Dep. 12–13, 24, 34; D. Dep. 39).

Shortly after the plaintiff was contacted by his son, he learned from Frank Clifford DiLorenzo that Certified Grocers of Illinois, Inc. was interested in purchasing a dairy manufacturing business. (Complaint, par. 8; L. Dep. 19). DiLorenzo has been the president since the founding in January, 1972, of Enviro-Technics, Inc., which carries on the business of architects, engineers and construction managers. (D. Dep. 3, 7). At the time that plaintiff's son told plaintiff about Hawthorn Mellody, Certified was one of Enviro's clients. (D. Dep. 6). At that time, Certified depended on DiLorenzo for general business counsel. (D. Dep. 23). For ten months from late in 1977 to September 1978, DiLorenzo was a vice president of Certified. (D. Dep. 8). Thereafter DiLorenzo continued as president of Enviro.

When the plaintiff learned from DiLorenzo of Certified's need for a dairy, he telephoned Joseph A. Gammon (L. Dep. 23), the president of National. (G. Dep. 4). Plaintiff confirmed with Gammon that National was interested in selling its Hawthorn Mellody dairy and told Gammon that plaintiff "had an interested buyer." (L. Dep. 24). Gammon then knew or learned that the plaintiff was the father of one of the employees of a National subsidiary. (L. Dep. 25). The plaintiff and Gammon agreed to meet to discuss the basis upon which National was willing to sell Hawthorn Mellody. (L. Dep. 25). There was no mention of a finder's fee or commission in the telephone conversation. (L. Dep. 26).

On March 18, 1975, the plaintiff, DiLorenzo and Howard Goode, Enviro's lawyer, went to National's offices at Louisville, Kentucky, where they met with Gammon. (G. Dep. 32; L. Dep. 26; Plf's. Br. 4). Donald McClinton, National's controller, was present for part of the meeting (L. Dep. 31; D. Dep. 54–55), which took forty-five minutes to one hour, according to DiLorenzo (D. Dep. 54) and two to three hours, according to the plaintiff. (L. Dep. 31). DiLorenzo described himself as the "protagonist" or spokesman at the meeting (D. Dep. 55), and the plaintiff deposed that his own input was very little, the bulk of the conversation being between Gammon and DiLorenzo. (L. Dep. 30).

At the meeting, Gammon advised the group that National would sell all of Hawthorn Mellody's Whitewater, Wisconsin, plants and all of its Chicago, Illinois, plants along with the going business for $18 million. (Plf. Ex. 8; G. Dep. 56; D. Dep. 57). It was understood at the meeting that DiLorenzo would learn if Certified was interested. (L. Dep. 32–33; D. Dep. 50–51).

During the Louisville meeting, no mention was made of a finder's fee or commission. (L. Dep. 34; D. Dep. 47–49, 82–83; G. Dep. 77, 89). After the meeting, the plaintiff had no further contacts with Certified

---

1. Herein for record references Kenneth A. Lirtzman is identified as KAL; the plaintiff

Max Lirtzman as L; Frank Clifford DiLorenzo as D; and Joseph A. Gammon as G.

regarding Hawthorn Mellody (L. Dep. 33) and none with National. (L. Dep. 49–50).

What happened after the meeting was that National insisted on selling the "package" of the Whitewater and Chicago plants as a going business (G. Dep. 62–63), whereas Certified was not interested in the going business (D. Dep. 62) and sought only the Chicago dairy plant. (D. Dep. 13, 23). National refused to split off and sell only the Chicago real estate and assets. (D. Dep. 13–14). After a few months, negotiations ended. (D. Dep. 63).

The plaintiff attached to his complaint a copy of a letter which he alleged he sent to Gammon on April 24, 1975, in which he wrote, "[a]s for Cliff (DiLorenzo) and myself, we would expect a normal finder's fee when and if the deal is consummated." (Plf's. Ex. 6). Gammon denied that he ever received such a letter (G. Dep. 73–74), but for the purpose of reviewing this summary judgment we accept that it was sent.[2]

Three and a half years later, on October 12, 1978, Hawthorn Mellody sold $1,375,000 of real estate and $765,000 of machinery and equipment located in Chicago to Certi-

fied.[3] Several months before the consummation of the sale, the plaintiff wrote a letter dated April 24, 1978, to Gammon demanding a finder's fee as "the procuring agent for this sale." (Plf. Ex. 11). On May 2, 1978, Gammon responded by letter to the plaintiff, denying any liability for a finder's fee. (Plf. Ex. 10). On June 1, 1979, the plaintiff filed this diversity action. Inasmuch as National had in 1978 been merged into Fuqua Industries, Inc., the action was brought against National and Fuqua.

The district court entered summary judgment for the defendants on the ground that the original 1975 transaction had been abandoned and that in 1978 the parties to the transaction consummated a wholly different deal for which the plaintiff was not the procuring cause. The district court in its Memorandum and Order of August 21, 1981, also said:

> To be sure, drawing all inferences in plaintiff's favor, the facts outlined above might possibly sustain a jury finding that some sort of implied contractual relationship was created by the circumstances surrounding the Louisville meeting. By

---

**2.** The April 24, 1975, letter is strange in many respects: (1) It bears the same day and month as the April 24, 1978, letter sent by the plaintiff to Gammon after the sale of Hawthorn Mellody assets. The April 24 date is obviously wrong because the letter refers to "meeting with you last week," referring to a meeting which occurred on March 18, 1975. The plaintiff testified on deposition that "[t]he letter may not have been prepared and mailed in the exact time frame." (L. Dep. 41). (2) The two letters dated in 1975 and 1978 have identical typing styles, including identical methods of inside address, salutation, block paragraphing, complimentary close and general typing style. The plaintiff testified that he did not recall whether he typed the 1975 letter or someone else did. (L. Dep. 37, 43–44). He did recall that he "used a common secretary with Cliff DiLorenzo at this time." (L. Dep. 37). (3) DiLorenzo's name is misspelled in *both* the 1975 and 1978 letters. DiLorenzo testified by deposition that his name was misspelled in the 1975 letter. (D. Dep. 65). He said "Max [Lirtzman] knows how to spell my name." (D. Dep. 66). Presumably DiLorenzo's secretary in 1975 would know how to spell his name also.

**3.** Inasmuch as the parties did not raise the issue, we do not consider it in our decision, but we note that the eventual sale was not of the

going business of Hawthorn Mellody but of real estate owned by Hawthorn Mellody for $1,375,000 and machinery and equipment for $765,000. (Defs. Memorandum in Support of Summary Judgment, Ex. A). DiLorenzo, whom the plaintiff originally thought would share a finder's fee, testified on deposition (D. Dep. 43):

> To the best of my knowledge, there is no such thing as a finder's fee, legally, unless it's an on-going business. Secondly, if you sell bricks and mortar or sticks and bricks, then there's a commission due as a real broker.
>
> \* \* \* \* \* \*
>
> All I know, and that's what you are here to prove, is that when a business is bought and a finder's fee is paid, it's a purchaser of an on-going business. I purchase, in the case of this dairy, if it was—I am going to purchase your vendors, your milk supply, and on-going business versus a static walk in and take over some assets.

*See Kilbane v. Dyas*, 33 Ill.App.3d 439, 441, 337 N.E.2d 217, 220 (1975) (" 'If real estate is going to be the principal element in the transaction, a broker has to have a license ....' ") (quoting *Baird v. Krancer*, 138 Misc. 360, 246 N.Y.S. 85, 88 (1930)). The plaintiff does not have a real estate broker's license. (L. Dep. 65).

directing Lirtzman and DiLorenzo to pursue further negotiations with Certified and by presenting them with financial data on Hawthorn-Mellody, Gammon provided a basis for a jury to conclude he had manifested consent to a contractual relationship.

In reviewing the propriety of a summary judgment, we must determine whether there is a genuine issue as to any material fact and whether the substantive law was correctly applied.

## II

Without objection from either party, the district court applied Illinois law. Only relatively recently have finders been given recognition in Illinois, and the ultimate contours of the legal concept are far from fully developed. It was not until 1973 that an Illinois appellate court clearly recognized the status of a finder, although the court held against the finder in that case.[4] *Modern Tackle Co. v. Bradley Industries, Inc.*, 11 Ill.App.3d 502, 507–09, 297 N.E.2d 688, 692–94 (1973). *Modern Tackle* established the principle for Illinois that a business opportunity broker or finder "must be the procuring cause of the transaction unless the contract specifies otherwise." 11 Ill. App.3d at 507, 297 N.E.2d at 693. *See also Annot., Validity, Construction, and Enforcement of Business Opportunities or "Finder's Fees" Contract*, 24 A.L.R.3d 1160, 1179.

There was obviously no express contract here and the plaintiff does not so contend. The plaintiff in order to succeed must rely either upon an implied-in-fact contract or a quasi-contract.

"An implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." *Bloomgarden v. Coyer*, 479 F.2d 201, 208 (D.C.Cir.1973). An implied-in-fact contract is governed by the law applicable to express contracts. "The parties' minds must meet through offer and acceptance, and the contract must be definite in its terms." *Bau v. Sobut*, 50 Ill.App.3d 732, 737, 8 Ill.Dec. 486, 490, 365 N.E.2d 724, 728 (1977).

In the plaintiff's initial telephone call to Gammon and in the March 18, 1975, meeting no mention was made of a finder's fee or commission. When the plaintiff wrote his 1975-dated letter he said "[a]s for Cliff and myself, we would expect a normal finder's fee." Cliff DiLorenzo testified by deposition that he "felt the claim was unwarranted" (D. Dep. 7), that it was "insanity" and "ludicrous." (D. Dep. 81).

The plaintiff has never received a finder's fee (L. Dep. 62, 65) and Gammon has never paid a finder's fee. (G. Dep. 84). Could two such persons' minds meet without any verbalization on what was a "normal finder's fee"? In fact, even in his discussions of a fee with DiLorenzo and Goode, out of Gammon's presence, the plaintiff never discussed the amount of such a fee or any formula for computing it. (L. Dep. 36).

We must yet examine the milieu in which the parties met to determine whether their non-verbal actions created an implied contract. In order to establish an implied-in-fact contract to pay for services, the party seeking payment must show that the services were carried out under such circumstances as to give the recipient reason

---

4. *Bittner v. American-Marrietta Co.*, 162 F.Supp. 486 (E.D.Ill.1958) distinguished a "finder" from a broker in a case where the principal office of the defendant was located in Chicago, Illinois. However, it is far from clear that the district court was applying Illinois law. The court, in denying a motion for summary judgment to apply a Chicago licensing ordinance, cited New York and California cases, and stated:

It is not disputed that the plaintiff was engaged in the brokerage business with Edward D. Jones Co. of St. Louis, Missouri; that the alleged contract of employment was not made in Chicago; that Dragon Cement Company is not located in Illinois; and that the plaintiff performed his services in locating a cement company outside of the city of Chicago.
*Id.* at 487.

to understand that they were not performed for some other person and that they were not rendered gratuitously. *Bloomgarden v. Coyer,* 479 F.2d 201, 208 (D.C.Cir. 1973).

When Gammon met with the plaintiff, DiLorenzo and Goode on March 18, 1975, Gammon understood that they represented Certified because they told him that they were builders for Certified. (G. Dep. 83, 89). In his written memorandum on March 19, 1975, Gammon stated: "Three gentlemen with Enviro-Technics, Ltd. visited with me this morning." (Plf. Ex. 8). Certified was then a client of Enviro and performing 100% of Certified's architectural and engineering services. (D. Dep. 20–21).

Hawthorn Mellody was a profitable company, but it simply did not make a sufficient profit for National's investment. (G. Dep. 37). Gammon said in his deposition that "it wasn't a matter of trying to find a buyer, it was a matter of a buyer coming to us . . . ." (G. Dep. 34). When the plaintiff, DiLorenzo and Goode came to Louisville on March 18, 1975, "on behalf of" Certified (D. Dep. 41), he had every reasonable expectation that he was dealing with principals or agents for Certified and not with finders.

DiLorenzo testified in deposition that Robert Korink, the president of Certified (D. Dep. 24), when approached prior to the March 18 meeting by DiLorenzo regarding the possibility that National would sell Hawthorn Mellody, "said he was interested and would I, you know, *on his behalf,* go out and look at it to see if it was possible." (D. Dep. 41; emphasis added). DiLorenzo explained in his deposition that he was authorized by Korink to investigate the situation although not to negotiate. (D. Dep. 50–51). Furthermore at the March 18 meeting DiLorenzo told Gammon that he "had discussed it with Bob Korink at Certified Grocers and he had expressed an interest and to investigate it . . . ." (D. Dep. 55–56).

Since DiLorenzo was the spokesman and did most of the talking (D. Dep. 55; L. Dep. 30), Gammon assumed that DiLorenzo represented Certified and that the plaintiff and Goode were DiLorenzo's assistants. (G. 88, 94). DiLorenzo's statement about discussing the situation with Korink confirmed that assumption.

All parties agreed that finder's fees or commissions were never discussed at the March 18 meeting or in the telephone conversation preceding the meeting. But the plaintiff contends that Gammon somehow should have divined that the plaintiff was seeking a finder's fee. The plaintiff stated in his deposition that Gammon "knew I wasn't there for my health" (L. Dep. 34) and "why else would I spend money for airplane tickets and go down there?" (L. Dep. 35).

The Louisville trip was completed in one day. (L. Dep. 28; D. Dep. 53). The length of the meeting was somewhere between forty-five minutes and three hours at the most. Enviro paid for the plaintiff's airplane fare to and from Louisville (L. Dep. 28, 35) and the travel expenses of the trip. (D. Dep. 38). Enviro's president DiLorenzo did not expect to be reimbursed for the air fare by either Certified or National. (D. Dep. 47).

The plaintiff was indeed not in Louisville for his health. He had excellent business reasons for being there. After he ceased his employment with Enviro, the plaintiff was paid by Enviro on a consulting basis. (D. Dep. 39–40). Plaintiff's company Comaco had a continuing relationship with Enviro. (L. Dep. 22). DiLorenzo testified in his deposition that on the flight back from Louisville (D. Dep. 47–48):

We felt it would work out. If it didn't work out and the—payment of a commission, we felt that the size of National, because of the introduction of good will created, that they had other divisions that Max and I hopefully could have through that. You know, gotten to know and done work for.

In other words DiLorenzo was currying favor with both Certified (D. Dep. 46–47) and National, and the plaintiff was currying favor with DiLorenzo, Certified through DiLorenzo, and National through Gammon.

In fact, his efforts bore fruit. He talked on one or two occasions by telephone to Gammon later in 1975 and as the plaintiff testified (L. Dep. 48):

> Well, it was very cordial, and on one of the conversations I told him I had heard that Tractor Supply Company, which was a subsidiary of National Industries, was thinking of going into a building program, and could Mr. Gammon introduce me to the president of Tractor Supply Company.
>
> And as I recall the conversation was very cordial, and he said, "Absolutely," and through him I met several of the officers of Tractor Supply Corporation.

The plaintiff was also interested in developing business with Color Tile, another National subsidiary, and the plaintiff "didn't want to lose the contact [Gammon]." (D. Dep. 64). So the plaintiff profited economically from his few hours spent in Louisville.

▮ Everything that occurred relative to the Certified-Hawthorn Mellody situation confirmed (1) that the plaintiff's services were rendered on behalf of Certified or on behalf of DiLorenzo representing Certified and/or (2) rendered gratuitously with the expectation of developing future good will with National. There was no implied-in-fact contract to pay a finder's fee.

### III

We have determined that there was no implied-in-fact contract. Was there a quasi-contract? A quasi-contract is not a contract at all, but a duty thrust under certain conditions upon one party to reimburse another party in order to avoid the first party's unjust enrichment. The District of Columbia Circuit well analyzed the elements of a quasi-contract claim in *Bloomgarden v. Coyer*, 479 F.2d 201 (D.C.Cir.1973):

> Generally, in order to recover on a quasi-contractual claim, the plaintiff must show that the defendant was unjustly enriched at the plaintiff's expense, and

that the circumstances were such that in good conscience the defendant should make restitution. Because quasi-contractual obligations rest upon equitable considerations, they do not arise when it would not be unfair for the recipient to keep the benefit without having to pay for it. Thus, to make out his case, it is not enough for the plaintiff to prove merely that he has conferred an advantage upon the defendant, but he must demonstrate that retention of the benefit without compensating the one who conferred it is unjustified.

> \*   \*   \*   \*   \*   \*

> Thus, in situations involving personal services, it has been variously stated that a duty to pay will not be recognized where it is clear that the benefit was conferred gratuitously or officiously, or that the question of payment was left to the unfettered discretion of the recipient. Nor is compensation mandated where the services were rendered simply in order to gain a business advantage. And the courts have reached the same conclusion where the plaintiff did not contemplate a personal fee, or the defendant could not reasonably have supposed that he did.

> \*   \*   \*   \*   \*   \*

> Nor, we add, can an uncommunicated expectation of remuneration serve the plaintiff's purpose where the defendant had no cause to believe that such was the fact.

> Thus we come full circle to the identical considerations which were dispositive of ... [the] claim for recovery on an implied-in-fact contract.

*Id.* at 211–12 (footnotes omitted).

▮ What we have said in regard to the absence of an implied-in-fact contract therefore also applies to whether there was a quasi-contract (*see* part II). It remains for us to examine whether good conscience mandates restitution. The plaintiff seeks as much as $93,000 [5] for his three hours in

---

**5.** The plaintiff has not specified in his complaint a dollar amount which he seeks as damages, but he relies on *Ehrman v. Cook Elec.*

*Co.*, 630 F.2d 529, 531, 532 (7th Cir. 1980), where the court refers to the "5, 4, 3, 2, 1 formula," which means 5% on the first million,

Louisville on that one day, but that, of course, is not determinative if in fact the other elements establishing a quasi-contract are present. The variance in the time spent and the reward sought, however, is an equitable consideration. DiLorenzo, for whom the plaintiff presumed to speak in his 1975 and 1978 letters, said in deposition that no fee was warranted on a moral basis because he and the plaintiff "didn't do anything" (D. Dep. 68–69); he said it was common knowledge that Hawthorn Mellody was for sale and that Certified needed a new dairy plant (D. Dep. 70); and he repeated several times in his deposition that it would be morally wrong to seek a finder's fee. (D. Dep. 68–69, 74, 75). Inasmuch as Certified had 640 stores in the Chicago area (Plf. Ex. 8), it could hardly have escaped National's notice that Certified was a potential buyer of Hawthorn Mellody.

There was no quasi-contract to pay a finder's fee as there was no implied-in-fact contract to pay one. We affirm the district court judgment on this additional ground.[6]

## IV

Finally, we reach the basis on which the district court entered summary judgment for the defendants: inasmuch as the 1975 transaction had been abandoned and in 1978 the parties consummated a wholly different transaction, the plaintiff was not the procuring cause of the ultimate transaction.

Gammon's memorandum written on the day of the March 18, 1975, meeting stated: "I made a tentative offer to sell them all the Whitewater [Wisconsin] plants and all of the Chicago plants *along with the going business* for $18 million, give or take a million." (Plf. Ex. 8; emphasis added). No one disputes that this was the offer. Plaintiff's son's affidavit[7] stated that his father "could possibly earn a fee if he were able to find a *buyer of Hawthorn-Mellody.*" (KAL affidavit, par. 3; emphasis added). In the plaintiff's April 24, 1975, letter to Gammon, he spoke about "a sale of Hawthorn Mellody to Certified Foods." (Plf. Ex. 6). In other words, the 1975 transaction was based upon the Whitewater and Chicago plants plus the "going business."

The 1975 deal was totally abandoned after a few weeks because Certified was only interested in the assets of one Chicago dairy plant. (D. Dep. 13). National refused to split off and sell the single asset. (D. Dep. 13–14). National had good business reasons for packaging the Wisconsin and Chicago holdings of Hawthorn Mellody because government regulations prevented selling milk from Wisconsin in the Chicago market, and the Wisconsin facilities, which were losing money, could most profitably be sold as a package with the more profitable Chicago holdings. (G. Dep. 111–12). Packaging the going business also had a reasonable business purpose because the sale price would then include an amount for good will. (G. Dep. 58–60).

Shortly after the March 18, 1975, meeting, the transaction that had been discussed was abandoned. Using DiLorenzo's language in his deposition, "negotiations were terminated" (D. Dep. 13); "negotiations were stopped" (D. Dep. 14); "it could not be

---

4% on the second million, etc. Applying that formula to the sale price of $2,140,000 would result in a fee of about $93,000.

**6.** We, therefore, disagree with the district court's conclusion that drawing all inferences in plaintiff's favor, the undisputed facts might possibly sustain a jury finding that some implied contractual arrangement was created. A court reviewing a summary judgment may affirm the judgment on a different or additional ground or legal theory. *Miller v. Gateway Transp. Co.*, 616 F.2d 272, 275 n.7 (7th Cir. 1980); *Securities and Exchange Comm'n v. Southwest Coal & Energy Co.*, 624 F.2d 1312, 1317 (5th Cir. 1980).

**7.** We note, without it affecting our decision, that a question of conflict of interest lurks in the background of this case. The plaintiff testified in deposition that his son in 1975 was the vice president of several of NII's subsidiaries (L. Dep. 14) and NII was a subsidiary of National. (KAL affidavit, par. 1). The son was also the secretary of Comaco, Inc. (L. Dep. 12). If Comaco became privy to facts important to National, did the son have a duty as an officer of both companies to advise National without expectation of compensation? *See, e.g., Armstrong v. Republic Realty Mortgage Corp.*, 631 F.2d 1344, 1348–49 (8th Cir. 1980).

done" (D. Dep. 63); "the deal was dead." (D. Dep. 67). The plaintiff was not the procuring cause of the sale of the Wisconsin and Chicago plants and the going business of Hawthorn Mellody.

■ In 1978, several intervening factors occurred. On January 3, 1978, National merged into Fuqua Industries, Inc. and the new management decided to write down and decrease the book value of Hawthorn Mellody's assets. (G. Dep. 35). Government regulations were changed to permit the sale of Wisconsin milk in the Chicago market, enabling Fuqua to sell the Chicago plant as an asset and to keep the Wisconsin facilities which were potentially more profitable with the advantage of the Chicago market. (G. Dep. 111–12). Fuqua could then afford to sell the Chicago real estate, machinery and equipment, for $2,140,000 to Certified, which it did. Hawthorn Mellody is still a going business as a subsidiary of Fuqua in the milk business, operating plants in Wisconsin as well as in other states. (G. Dep. 28).

The plaintiff played no part in the sale of the Chicago plant to Certified. The district court properly concluded that the plaintiff was not the procuring cause of that sale. In addition to the fact that the 1978 transaction was an entirely different one than the 1975 proposal, the merger of National into Fuqua, Fuqua's writing down of Hawthorn Mellody's assets, and the change in government regulations relating to the sale of Wisconsin milk in the Chicago market were intervening causes or instrumentalities which in fact enabled the 1978 sale to be made and foreclosed the possibility of the plaintiff being the procuring cause of the 1978 sale. *See Modern Tackle Co. v. Bradley Industries, Inc.*, 11 Ill.App.3d 502, 507, 297 N.E.2d 688, 693 (1973). The district court properly granted summary judgment for the defendants.

The judgment of the district court is affirmed.

SWYGERT, Senior Circuit Judge, dissenting.

In reviewing the grant of a summary judgment motion we must determine whether there is a genuine issue as to any material fact. A court should grant summary judgment only if it is certain that there are no unresolved factual issues. *Greenebaum Mortgage Co. v. Town & Garden Associates*, 385 F.2d 347, 349 (7th Cir. 1967). The court should view the materials before it in the light most favorable to the party opposing the motion, and must give him the benefit of all reasonably drawn inferences. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). We do not try the issues of fact; we only determine whether there are issues to be tried. *Homan Mfg. Co. v. Long*, 242 F.2d 645, 656 (7th Cir. 1957).

The majority affirms the district court on two grounds. First, contrary to the district court, the majority asserts that there is no genuine issue of fact as to whether there was an implied contract between the parties. Second, the majority agrees with the district court that there is no genuine issue of fact as to whether the plaintiff was the procuring cause of the eventual transaction. I disagree. I believe that both issues are best left to the trier of fact.

I

The majority contends that there was no contract. It states that the verbal acts as well as the surrounding circumstances cannot support the conclusion that there was a meeting of the minds as to whether plaintiff was to serve as a finder for the defendant.

First, the majority states that the parties never discussed the amount of a finder's fee, or any formula for computing it. Nonetheless, a contract for a finder's fee can be formed without an explicit determination of the amount of the fee; if unstated, the amount is what is reasonable under the circumstances. *Ehrman v. Cook Electric Co.*, 630 F.2d 529, 531 (7th Cir. 1980).

Second, the majority contends that the circumstances surrounding the parties' interaction did not create an implied-in-fact contract. The issue is not whether the

plaintiff's case is strong or weak; the issue is whether "under Illinois law there were sufficient factual questions to mandate jury consideration." *Id.* at 530–31, n.4. Gammon could not reasonably think that Lirtzman was acting gratuitously. The only reasonable explanations for his presence, therefore, was either that he was working on behalf of DiLorenzo and Certified or that he was acting as a finder, *i.e.*, he was bringing the parties together. The majority concludes that Gammon reasonably assumed that DiLorenzo represented Certified and that Lirtzman was his assistant. I do not see how the limited evidence available to us compels this conclusion. I would leave the drawing of inferences to the trier of fact. Its role is to determine what a person reasonably assumed in light of the circumstances before him.

Third, the majority contends that Lirtzman was currying favor with both Certified and National through his actions. Even if true (and again, this is an inference that the trier of fact should make), this is not inconsistent with his also being a finder.

Dispute about whether a contract has been formed are disputes about "states of mind." What was the intent of the parties, and what was the respective uptake of each party as to the intent of the other? Contractual intent is "traditionally understood to be for the trier of fact." *Charbonnages De France v. Smith*, 597 F.2d 406, 415 (4th Cir. 1979). Moreover, comprehending a person's intent involves making inferences from what he says or does, or does not say or do. Disputed inferences made from the undisputed facts are not properly decided by summary judgment. *American Fidelity & Casualty Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (4th Cir. 1965). Both factors are present in this case, and both factors are peculiarly insusceptible to summary judgment.

The district court held that Lirtzman presented considerations from which a jury might infer that a contract existed. I agree. I believe that the majority has incorrectly played the role of trier of fact. *See Ehrman v. Cook Electric Co.*, 630 F.2d 529, 531 (7th Cir. 1980).

II

In order to prevail the plaintiff must show not only that there was a contract between him and the defendant, but also he must show that he was the procuring cause of the 1978 transaction. The majority presents two distinct arguments in holding that the plaintiff was not the procuring cause of the 1978 sale. First, it contends that the 1978 sale was entirely different from the 1975 proposal in which the plaintiff was involved. Second, it argues that several events that amounted to intervening causes occurred between 1975 and 1978.

In 1975 National proposed selling its Wisconsin and Chicago plants. This proposal fell through because Certified was interested only in the Chicago plant, and National refused to split off and sell the single asset. In 1978, however, National did split off and sell the Chicago plant to Certified. It escapes me how these two transactions are "entirely different." If A proposes to purchase "Block Avenue" from B, while B only wants to sell "Block Avenue and White Avenue" together, but if eventually B does decide to sell "Block Avenue" to A, it seems to me that the eventual sale is very much related to the original proposal. Lirtzman brought to Certified's attention that National wanted to sell its assets, and eventually Certified got what it wanted of these assets. I think it is quite clear that the eventual deal is intimately related to the original proposal—the relationship is that of part to whole.

A person is not the procuring cause of a transaction if the transaction comes about only because of intervening causes. The majority holds that three intervening events, either separately or together, constituted intervening causes. The three events are (1) the merger of National into Fuqua; (2) the consequent writing down of Hawthorn-Mellody's assets; and (3) the change in government regulations relating to the sale of Wisconsin milk in the Chicago market. These events, it says, enabled the 1978 sale to be made and thereby foreclosed the pos-

sibility of the plaintiff being the procuring cause of the sale. These events may or may not have constituted intervening causes—I do not profess to know on the limited evidence available to us. What puzzles me is how the majority can resolve this issue without engaging in the role of a trier of fact. The issue of causation is quintessentially a factual one. The defendant has alleged that these intervening events enabled the sale to take place; the plaintiff contests this assertion. The dispute is a factual one. It seems to me that each side should be allowed to present its views and make its best case to the trier of fact. The factfinder should determine whether these events constitute intervening causes.

I dissent.