802 F.2d 457
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Frank D. GENTILE, et al., Plaintiffs-Appellants,
v.
The YOUNGSTOWN STEEL DOOR Co. and National City Bank,
Defendants-Appellees.
 No. 84-3648.
 United States Court of Appeals,
Sixth Circuit.
 Aug. 25, 1986.
 
 Before MARTIN and GUY, Circuit Judges, and BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 This case involves the modification of health and life insurance plans covering individuals who retired from salaried, non-union employment with Youngstown Steel Door Company (Youngstown) before 1984. Plaintiffs' complaint alleged the modifications, which instituted premium sharing as well as deductible requirements, constituted a breach of contract and violated rights established by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. S5 1001, et seq. Plaintiffs sought reinstatement of their previous welfare benefits plan. Following a non-jury trial, the district court rendered judgment in favor of Youngstown, finding that the company had retained the right to modify or terminate its life and health insurance plans for salaried retirees. For the reasons which follow, we reverse in part and remand the case to the district court.
 
 I.
 
 2
 On November 15, 1983, Youngstown sent a letter to all of its retirees (both hourly and salaried) advising them that their health and life insurance plans would be modified as of January 1, 1984. It was explained in the letter that the changes were necessary due to the losses which the company had incurred over the prior four years. The planned modifications were as follows.
 
 
 3
 Under the new life insurance plan, retirees over the age of sixty-five pay 50% of their insurance premiums, while retirees under the age of sixty-five pay 30% of their premiums. Previously the company had paid the entire premium.
 
 
 4
 The new health insurance plan differs from the previous plan in three respects. First, the new plan instituted premium sharing; retirees over age sixty-five pay 50% of the premiums and retirees under age sixty-five pay 30%. Second, the new plan contains deductible and co-insurance provisions not contained in the previous plans. The third distinction between the old and new health insurance plans is to the benefit of retirees. The new plan includes a major medical benefits program, while the prior plan only included an optional program, with the entire premium charged to the retiree.
 
 
 5
 At trial, several exhibits were entered, primarily consisting of the summary plan descriptions and certificates of insurance insurance documents that had been distributed to plaintiffs before their retirement. These exhibits describe the benefits to which plaintiffs were entitled during the operative time period of the documents. In addition, several individual plaintiffs testified that Youngstown had promised them during exit interviews that their health and/or life insurance benefits would be paid for the rest of their lives. Contrary to this testimony, however, Jack Jones, Youngstown's Director of Industrial Relations, who conducted the exit interviews, denied that he ever made any such representations.
 
 
 6
 Youngstown presented evidence at trial that it had historically provided its salaried employees with approximately the same fringe benefits as it provided its unionized, hourly employees. For instance, the health insurance benefits provided by Youngstown to its salaried retirees had 'changed several times in the past ten years. Each change was to the benefit of the retiree, and each change was precipitated by a change in the collective bargaining agreement which the company had reached with its hourly employees. In addition, when the company negotiated cost of living, vision, dental, and extended vacation plans with the hourly employees, the company likewise implemented similar plans for its salaried employees.
 
 
 7
 Upon this evidence, the district court concluded that Youngstown had retained the right to modify its insurance plans for salaried retirees, and thus plaintiffs failed to establish that the 1984 modifications constituted a breach of contract. This conclusion was based on the following reasoning. The court first examined the documents governing Youngstown's insurance plans for salaried employees and concluded that they were all silent as to the duration of the coverage which they described. Findings of Fact and Conclusions of Law p 9. The court, therefore, was required to determine the intent of the parties regarding the employer's right to modify the benefit plans. See UAW Local 134 v. Yard-Man, Inc., 716 F.2d 1467, 1479 (6th Cir.1983), cert. denied, 456 U.S. 1007 (1984). In determining the parties' intent, the court found that Youngstown's course of conduct had created an implied-in-fact contract between the company and its retirees, requiring Youngstown to always provide its salaried retirees with substantially the same insurance benefits which it provided its hourly retirees under the collective bar gaining agreement. Id. p 9. This finding was grounded in a subsidiary finding that Youngstown had historically treated its salaried and hourly employees in a comparable fashion with respect to post-retirement insurance benefits. In 1984, Youngstown instituted identical changes in the benefit plans provided to hourly retirees as it instituted in the salaried retirees' plans. The court therefore looked to the documents covering the insurance plans for hourly retirees, and concluded, ipse dixit, that Youngstown had explicitly retained the right to terminate or modify its insurance plans for hourly retirees. Id. p 8. Therefore, the court found that Youngstown had similarly retained the right to modify its life and health 'insurance plans for salaried retirees.
 
 II.
 
 8
 The error in the district court's resolution of this case is found in its preliminary finding that an implied contract existed between Youngstown and its salaried employees, the terms of which require Youngstown to always provide its salaried retirees benefits comparable to those provided to its hourly employees. The court found specifically:
 
 
 9
 [Youngstown] has a policy of providing salaried retirees with substantially the same insurance benefits as are provided to hourly retirees under the collective bargaining agreement then in effect. The salaried retirees have accepted the benefits of this policy for many years without objection until the filing of this lawsuit. This course of conduct between the parties establishes an implied contract that imposes on the Company the burden of providing salaried retirees with insurance benefits that are comparable to those provided hourly retirees.
 
 
 10
 Findings of Fact and Conclusions of Law p 9.
 
 
 11
 Having found an implied-in-fact contract, the court was thrust into the troublesome task of determining whether Youngstown had legally retained the right to modify the benefits of its unionized, hourly employees. This court has recently decided a number of cases construing the terms of collective bargaining agreements to determine the intended duration of union retirees' welfare benefits. See, e.g., Weimar v. Kurz-Kasch, Inc., 773 F.2d 669 (6th Cir.1985); Policy v. Powell Pressed Steel Co., 770 F.2d 609 (6th Cir.1995), cert. denied, 106 S. Ct. 1202 (1986)., Yard-man, 716 F.2d 1476; Upholsterers' International Union of AFL-CIO v. American Pad & Textile Co., 372 F.2d 427 (6th Cir.1967), As those cases illustrate determining the duration of benefits under a collective bargaining agreement is a difficult task requiring an interpretation of the collective bargaining agreement as a whole, Yard-Man, 716 F.2d at 1479-83. The district court's conclusion that Youngstown had retained the right to terminate or modify the insurance benefits of its hourly retirees, referencing a single line from a 1976 "Program of Insurance Benefits" booklet as support for the conclusion, belies the difficulty of the task. Nevertheless, we need not determine whether the district court's conclusion was ultimately correct, since we find that the court was incorrect in finding an implied-in-fact contract.[1]
 
 
 12
 An implied-in-fact contract is a true contract, requiring all the necessary elements of any other binding agreement, i.e., offer, acceptance, and consideration. An implied-in-fact contract differs from other contracts only in that i t is not expressly stated or written. Instead, the contract is "inferred from the conduct of the parties in the milieu in which they dealt." Bloomgarden v. Coyer, 479 F.2d 201, 208 (D.C.Cir.1973). Like any other contract, the terms of the contract must be definite. Lirtzman v. Fuqua Industries Inc., 677 F.2d 548, 551 (7th Cir.1982).
 
 
 13
 The district court improperly transformed what it accurately characterized as a "course of conduct" into an "implied-in-fact contract." The two concepts are not necessarily synonymous. For instance, a course of conduct might be found where an implied contract could not be because of a lack of consideration. In fact, in this case it is questionable whether the implied-in-fact contract which the district court found is supported by consideration. The issue is whether the salaried retirees have given up anything in exchange for Youngstown's implied promise to always provide them with benefits similar to those provided to unionized retirees. It could be argued that the retirees' years of service as active employees provided the consideration for the company's promise to treat them in much the same fashion as it treats its unionized employees with respect to benefits. This, however, would require a showing that the retirees were aware of the course of conduct when they were active employees. Although it is difficult to tell from the transcript before the court, the testimony of Bernard Scheidler, president of Youngstown, indicates that the policy of treating the two groups of employees similarly did not commence until the mid-1960s. It is impossible to tell when, if ever, the active salaried employees understood that there was a policy linking their benefits to those received by hourly employees. Not until the active salaried employees became aware of the policy and assented to it can it be argued that their service for the company constituted consideration for the implied-in-fact contract. The district court erred in not making such a finding before concluding that an implied contract existed.
 
 
 14
 Apart from potential consideration problems, the implied-in-fact contract posited by the district court fails for a lack of definiteness. Bernard Scheidler testified at the trial as to the nature of the link between the hourly and salaried employee benefits:
 
 
 15
 Q. Now, you said that there was not a direct link. Can you explain what you meant by that?
 
 
 16
 A. Our interest was not in passing on to our salaried people precisely and exactly what we had negotiated with the union, but in one fashion or another, either through wage adjustments or merit paid plan or other possible increases or improvements of certain benefits to attempt to keep our salary people whole and in a broad sense, but not precisely benefits.
 
 
 17
 Joint Appendix at 96-97. Scheidler further testified as to the purpose of the policy:
 
 
 18
 [Prior to my arrival at Youngstown, we] did not have a practice of doing similar things for salaried people which were negotiated with hourly people. I felt that was wrong and voiced myself accordingly that I think when we sit down to negotiate packages for our union that we have got to plan ... on doing the same thing for the salaried people. We can't let one group of em ployees through ... their union status get an upper hand on our salaried people with the same ability.
 
 
 19
 Joint Appendix at 96. 1t is readily apparent from Scheidler's uncontradicted testimony that the policy of Youngstown of maintaining rough equality of benefits between salaried and hourly employees, without more, is too indefinite to create an implied-in-fact contract between the company and its salaried retirees.
 
 III.
 
 20
 Having rejected the district court's conclusion with respect to an implied-in-fact contract, the issue arises whether plaintiff can nonetheless prevail on a contract theory which is not dependent on a link between salaried and hourly employees' benefits. Unlike a case dealing with unionized retirees, there is no collective bargaining agreement which we can turn to in order to determine the terms of the contract between the company and the retirees. See Yard-Man, 716 F.2d at 1479 ("any ... surviving benefit must find its genesis in the collective bargaining agreement"). However, very recently this court determined, in a case of first impression, "the appropriate federal rule of decision governing the termination of nonunion retiree welfare benefit plans where the employer pays the entire cost of benefits." In re White Farm Equip ment Co., 788 F.2d 1186, 1191 (6th Cir. 1986).
 
 
 21
 White Farm arose out of bankruptcy proceedings where plaintiffs, salaried retirees, sued defendant seeking an injunction requiring retroactive reinstatement and continued funding of the retirees' welfare benefits. The bankruptcy court found that since the company had unambiguously reserved the right to amend or terminate the plan in its plan documents, plaintiffs could not establish a breach of contract. In re White Farm Equipment Co., 23 B.R. 85 (Bankr.N.D. Ohio 1982). The district court reversed, developing a principle of federal common law which would require that welfare benefits of salaried employees vest upon retirement and cannot be terminated or modified, even in the face of plan language unequivocally reserving the right to amend or terminate. In re White Farm Co., 42 B.R. 1005 (N.D. Ohio 1984).
 
 
 22
 On appeal to this court, we reversed the district court judgment and remanded the case to the bankruptcy court for further analysis of the plan documents to determine whether the company had indeed unambiguously reserved the right to terminate or modify the benefits. We found that "it is settled law that an employer and an employee may contract for post-emloyment welfare benefits, and this court must, in this case as in Yard-Man and the other collective bargaining cases, interpret the contract's terms." White Farm, 788 F.2d at 1191. See also In re Erie Lackawana Railway Co., 548 F.2d 621, 625-27 (6th Cir.1977). The terms of the contract between the employer and the salaried retiree are set forth in the plan documents which were distributed to the retiree as an active employee'.
 
 
 23
 We conclude ... that the parties may themselves set out by agreement or private design, as set out in plan documents, whether retiree welfare benefits vest, or whether they may be terminated. In construing such agreements, courts may draw inferences or make presumptions as this court has done in construing collective bargaining agreements providing welfare benefit plans.
 
 
 24
 White Farm, 788 F.2d at 1193 (citations omitted).
 
 
 25
 In light of White Farm, we must remand this case to the district court for further proceedings. On remand, the court must focus on the plan documents which were distributed to the retirees while they were active employees to determine the terms of their contract with the company.[2] Since there are currently thirteen retirees involved in this case, each of whom presumably retired at a different time, it may be that the contractual terms will differ among the retirees depending upon when they retired. The court must also determine the effect, if any, of any benefit increases which plaintiffs received subsequent to their retirement. In other words, should the benefit increases be construed as part of the retirees' contract with the company or are they gratuitous and terminable at the will of the company?
 
 IV.
 
 26
 Should the court on remand still find that plaintiffs are not entitled to relief on a contract theory, the court must also consider whether plaintiffs are entitled to relief for the ERISA reporting and disclosure violations which they allege. In this respect, the court must determine first whether plaintiffs' allegations of reporting and disclosure violations are correct and, second, assuming they are correct, whether plaintiffs are entitled to relief under ERISA as a result of the alleged omissions, e.g., was there detrimental reliance? See, e.g., Govani v. Bricklayers, Masons and Plasterers International Union of America, 732 F.2d 250, 252 (1st Cir.1984).
 
 
 27
 Accordingly, we REMAND to the district court for further proceedings consistent with this opinion.